[No. 66318-6-I. Division One. May 7, 2012.]

THE NEWPORT YACHT BASIN ASSOCIATION OF CONDOMINIUM
OWNERS, *Appellant*, v. SUPREME NORTHWEST, INC.,
ET AL., *Respondents*.

58

60

*Christopher I. Brain* and *Mary B. Reiten* (of *Tousley Brain Stephens PLLC*), for appellant.

*Gary D. Huff* (of *Karr Tuttle Campbell*) and *Scott E. Collins* (of *Helsell Fetterman LLP*), for respondents.

¶1 DWYER, J. — Where the language of a recorded quitclaim deed unambiguously expresses the intent of the grantor to convey all of his or her interest in real property, extrinsic evidence may not be used to demonstrate an intent to convey some lesser interest. Here, the Newport Yacht Basin Association of Condominium Owners (NYBA) appeals from the trial court's order denying its claim to quiet title to property described in a 1981 quitclaim deed. The trial court determined that the deed was not intended to convey fee simple title and that, even if this had been the

intent of the parties, the deed was nevertheless unenforceable for a variety of legal and equitable reasons. However, because the language of the deed at issue unambiguously documents the intent of the grantors to convey fee title, the trial court erred by resorting to extrinsic evidence in order to derive a finding of intent that contradicts the written words of the deed. As the result of our review of this issue and other, ancillary, issues, we reverse in part and affirm in part.

I

¶2 In 2007, a commercial boat dealer, Supreme Northwest Inc. (doing business as Seattle Boat), purchased lakefront property (the commercial parcel) and an associated boat business for $4.15 million from Bridges Investment Group LLC. After closing, Seattle Boat sought approval from the city of Bellevue (City) to build a new storage and sales facility. NYBA, an unincorporated condominium association that manages the marina adjacent to the commercial parcel, was initially supportive of Seattle Boat's redevelopment plans. In the months following the sale, Alan Bohling, the president of Seattle Boat, and Kyle Anderson, the president of NYBA's board of directors, maintained an ongoing discussion of Seattle Boat's redevelopment plan and NYBA's resulting concerns regarding parking, ingress, egress, and traffic. However, following the City's issuance of a declaration of nonsignificance—an important checkpoint in the approval process—NYBA's membership voted overwhelmingly to oppose Seattle Boat's redevelopment project.

¶3 In June 2008, NYBA retrieved from its safe a document entitled "Quit Claim Deed," which purported to convey three legally described strips of the commercial parcel from its original owners, John Radovich[1] and Russell

---

[1] John Radovich passed away in December 2011, prior to oral argument of this appeal. His wife, Carol Radovich, as personal representative of his estate, has been

Keyes, to NYBA in 1980. The quitclaim deed had been properly recorded in 1981. An accompanying real estate tax affidavit, signed by NYBA's then-vice president and filed with the quitclaim deed, described the deed as a "document in correction of easements." Because the three strips of land described in the deed (designated as parcels A, B, and C) were located within the area that Seattle Boat was intending to redevelop, the permitting process was suspended until the validity of the quitclaim deed could be determined.

¶4 Both the commercial parcel and adjacent marina were previously owned by Radovich and Keyes. The two partners acquired the marina, submerged lands, and uplands in 1975. They converted the marina to condominium property in 1978. At this time, Radovich recorded a declaration of easements, which created 10 easements on and around the commercial parcel and the newly formed NYBA property. The legal descriptions of the boundaries of three of these easements—easements 4, 5, and 6—are identical to the descriptions of the land that Radovich and Keyes later conveyed to NYBA in the 1981 quitclaim deed.

¶5 Following the creation of the condominium, Radovich and Keyes leased the upland commercial parcel to Douglas Burbridge, who thereafter operated a boat business, Mercer Marine, on the property. In 1983, Burbridge agreed to purchase Keyes' one-half undivided interest in the commercial parcel. Keyes conveyed his interest by statutory warranty deed in 1991. In 2004, Burbridge formed Bridges and conveyed his interest in the commercial parcel to this investment company. In 2004, Bridges also purchased Radovich's one-half undivided interest in the commercial parcel. Both the deed from Keyes to Burbridge and the deed from Radovich to Bridges included the land described in the 1981 quitclaim deed. Similarly, when Bridges conveyed the commercial parcel to Seattle Boat by bargain and sale deed

---

substituted as a party in this action. In this opinion, we use the surname Radovich to refer either to Mr. Radovich or his estate, as the context dictates.

in March 2007, this deed also included the land that had been described in the 1981 quitclaim deed.

¶6 In September 2008, NYBA brought suit against Seattle Boat, seeking a declaratory judgment quieting title to the three strips of land described in the quitclaim deed. It sought entry of a judgment declaring that the quitclaim deed either conveyed fee title to the property described therein or granted NYBA exclusive rights in that property. Seattle Boat counterclaimed based on adverse possession and brought a third party complaint against Burbridge and Bridges for failure to convey good title to the entire commercial parcel. Thereafter, Bridges brought a fourth party complaint against Radovich and Keyes for breach of their agreements to convey good title to the commercial parcel.

¶7 After a two-week bench trial, the trial court entered detailed findings of fact and conclusions of law in favor of Seattle Boat. The court determined that the 1981 quitclaim deed was not intended to convey fee simple title and, in addition, that the deed was unenforceable on a variety of legal and equitable bases.

¶8 NYBA appeals.

## II

¶9 NYBA first contends that, because the 1981 quitclaim deed unambiguously expressed the intent of Radovich and Keyes to convey fee title to the three strips of land described in the deed, the trial court erred by concluding that the deed did not convey fee title. We agree.

¶10 In a bench trial where the trial court has weighed the evidence, our review is limited to determining whether substantial evidence supports the trial court's findings of fact and whether those findings support the court's conclusions of law. *Standing Rock Homeowners Ass'n v. Misich*, 106 Wn. App. 231, 242-43, 23 P.3d 520 (2001). "Substantial evidence" is a quantum of evidence sufficient to persuade a rational, fair-minded person that

the premise is true. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). We review questions of law and conclusions of law de novo. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003) (citing *Veach v. Culp*, 92 Wn.2d 570, 573, 599 P.2d 526 (1979)).

■ ■ ¶11 "[D]eeds are construed to give effect to the intentions of the parties, and particular attention is given to the intent of the grantor when discerning the meaning of the entire document." *Zunino v. Rajewski*, 140 Wn. App. 215, 222, 165 P.3d 57 (2007). Interpretation of a deed is a mixed question of fact and law. *Affiliated FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 459 n.7, 243 P.3d 521 (2010). What the parties intended is a question of fact and the legal consequence of that intent is a question of law. *Affiliated FM*, 170 Wn.2d at 459 n.7.

■ ¶12 In general, we determine the intent of the parties from the language of the deed as a whole. *Sunnyside Valley*, 149 Wn.2d at 880 (citing *Zobrist v. Culp*, 95 Wn.2d 556, 560, 627 P.2d 1308 (1981)). "In the construction of a deed, a court must give meaning to every word if reasonably possible." *Hodgins v. State*, 9 Wn. App. 486, 492, 513 P.2d 304 (1973) (citing *Fowler v. Tarbet*, 45 Wn.2d 332, 334, 274 P.2d 341 (1954)). It has long been the rule of our state that, where the plain language of a deed is unambiguous, extrinsic evidence will not be considered.[2] *Sunnyside Valley*, 149 Wn.2d at 880; *In re Estate of Little*, 106 Wn.2d 269, 287, 721 P.2d 950 (1986); *City of Seattle v. Nazarenus*, 60 Wn.2d 657, 665, 374 P.2d 1014 (1962); *Tacoma Mill Co. v. N. Pac. Ry.*, 89 Wash. 187, 201, 154 P. 173 (1916) ("[I]f the intention of the parties may be clearly and certainly determined from the language they employ, recourse will not be had to extrinsic evidence

---

[2] An exception to this general rule exists where the grantor of a quitclaim deed claims that the deed was given as an equitable mortgage. *See Gossett v. Farmers Ins. Co. of Wash.*, 133 Wn.2d 954, 966, 948 P.2d 1264 (1997); *Pittwood v. Spokane Sav. & Loan Soc'y*, 141 Wash. 229, 233, 251 P. 283 (1926). Because neither party contends that the quitclaim deed at issue was given as an equitable mortgage, this exception is not germane herein.

for the purpose of ascertaining their intention.").[3] This rule is a practical consequence of the permanent nature of real property—unlike a contract for personal services or a sale of goods, the legal effect of a deed will outlast the lifetimes of both grantor and grantee, ensuring that evidence of the circumstances surrounding the transfer will become both increasingly unreliable and increasingly unobtainable with the passage of time. Accordingly, the language of the written instrument is the best evidence of the intent of the original parties to a deed.

¶13 Nevertheless, where ambiguity exists, extrinsic evidence may be considered in ascertaining the intentions of the parties. *Sunnyside Valley*, 149 Wn.2d at 880. In such a situation, we will consider the circumstances of the transaction and the subsequent conduct of the parties in determining their intent at the time the deed was executed. *King County v. Hanson Inv. Co.*, 34 Wn.2d 112, 126, 208 P.2d 113 (1949). Moreover, where we remain in doubt as to the parties' intent, in general, " 'a deed will be construed against the grantor.' "[4] *Ray v. King County*, 120 Wn. App. 564, 587 n.67, 86 P.3d 183 (2004) (quoting 17 WILLIAM B. STOEBUCK, WASH-

---

[3] As Professor Stoebuck has explained, "[o]ne does not need rules to interpret a document that is clear on its face, but only when it is in some way unclear." 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 7.9, at 485 (2d ed. 2004). This is also the approach of other jurisdictions. "Where there is no ambiguity in the language used in a deed, the intention of the parties must be arrived at from such language, giving it its common and accepted meaning." 23 AM. JUR. 2D *Deeds* § 194 (2002) (footnote omitted); *see, e.g., Peterson v. Barron*, 401 S.W.2d 680, 685 (Tex. Civ. App. 1966) ("It is elementary, of course, that there must be some ambiguity in a deed before extrinsic evidence is admissible to vary the terms thereof.").

[4] Seattle Boat asserts that, because NYBA was the drafter of the quitclaim deed, the association should not benefit from any presumption in favor of the grantee and against the grantor. *See, e.g., Hanson Indus., Inc. v. Spokane County*, 114 Wn. App. 523, 531, 58 P.3d 910 (2002). However, this rule of construction is based not merely on the reality that the grantor is generally also the drafter, but also on the principle that a grantor cannot derogate from his grant. 17 STOEBUCK & WEAVER, *supra*, § 7.9, at 486 n.9. At least one court has held that, where a grantee has drafted the deed, ambiguities should be resolved in favor of neither party. *Harris v. Ski Park Farms, Inc.*, 62 Wn. App. 371, 375-76, 814 P.2d 684 (1991), *aff'd*, 120 Wn.2d 727, 844 P.2d 1006 (1993). Regardless, because the language of the quitclaim deed at issue is unambiguous, we need not determine in what direction the presumption should run.

INGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 7.9, at 463 (1995)).

¶14 The form of quitclaim deeds in Washington is governed by statute. The relevant statute stipulates that a quitclaim deed "may be in substance" in the following form:

> The grantor (here insert the name or names and place of residence), for and in consideration of (here insert consideration) conveys and quitclaims to (here insert grantee's name or names) all interest in the following described real estate (here insert description), situated in the county of . . . . . . , state of Washington. Dated this . . . . day of . . . . . . , 19. . .

RCW 64.04.050.

¶15 Here, the 1981 quitclaim deed states that "[t]he Grantors . . . convey[ ] and quit claim[ ] to [NYBA] the following described real estate, situated in the County of King, State of Washington, together with all after acquired title of the grantor(s) therein." The deed then recites the legal descriptions of three "strip[s] of land," parcels A, B, and C, that are identical to the legal descriptions of easements 4, 5, and 6 appearing in the declaration of easements previously issued to NYBA by Radovich and Keyes. Significantly, the deed also reserves to the grantors an easement for ingress and egress across parcel C. The deed is dated July 23, 1980.

¶16 Seattle Boat contends that the grantors' failure to employ the words "all interest in" creates a facial ambiguity in the deed that must be resolved by resort to extrinsic evidence. By omitting this "key phrase," Seattle Boat asserts, the grantors left unclear whether the deed was intended to convey all of their rights of ownership in the described parcels.[5] Where a statement is capable of two or more meanings, it is ambiguous. *Hoglund v. Omak Wood*

---

[5] As Seattle Boat correctly points out, unlike deeds that follow the statutory warranty or bargain and sale deed form, a quitclaim deed does not carry with it a presumption that a fee simple estate is being transferred. *Roeder Co. v. K&E Moving & Storage Co.*, 102 Wn. App. 49, 56, 4 P.3d 839 (2000).

*Prods., Inc.,* 81 Wn. App. 501, 504, 914 P.2d 1197 (1996). The question of ambiguity is a matter of law to be determined by the court. *Hoglund,* 81 Wn. App. at 504.

¶17 As an initial matter, a quitclaim deed need not precisely match the form described in RCW 64.04.050 in order to convey fee title. To the contrary, the statute stipulates that where a deed "in substance" conforms to the statutory language, the deed "shall be deemed and held a good and sufficient conveyance, release and quitclaim to the grantee . . . in fee of all the then existing legal and equitable rights of the grantor in the premises therein described." RCW 64.04.050. No Washington court has concluded that a quitclaim deed must contain the phrase "all interest in" to validly convey fee simple title. Indeed, as Professor Stoebuck has explained, the operative words of a quitclaim deed are "conveys and quitclaims." 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 14.2, at 116 (2d ed. 2004). It has long been the rule that a valid quitclaim deed " 'passes all the right, title, and interest which the grantor has at the time of making the deed and which is capable of being transferred by deed, unless a contrary intent appears.' " *McCoy v. Lowrie,* 44 Wn.2d 483, 486, 268 P.2d 1003 (1954) (quoting K.A. Drechsler, Annotation, *Rights or Interests Covered by Quitclaim Deed,* 162 A.L.R. 556, 557 (1946)).

¶18 Moreover, with regard to the quitclaim deed at issue herein, any potential ambiguity created by the absence of the words "all interest in" is dispelled when every word of the deed is given meaning. *See Fowler,* 45 Wn.2d at 334 ("It is the duty of the court to construe a deed so as to give some meaning to every word, if reasonably possible."). In addition to conveying the then-existing rights of the grantor, a quitclaim deed may also convey after-acquired title if words to this effect appear in the deed. RCW 64.04.050. The 1981 quitclaim deed specifies that, in addition to granting to NYBA the "real estate" described therein, the deed also conveys "all after acquired title" of the grantors to the

described parcels. The inclusion of this language negates the possibility that the grantors intended anything but the conveyance of their entire interest in the described property. Even were the grantors to have held less than fee title to the parcels at the time the deed was executed, any and all later-obtained ownership interest was also conveyed to NYBA by the deed through inclusion of this language.

¶19 This conclusion is further bolstered by the grantors' reservation of an easement "for ingress and egress" over a portion of parcel C described in the deed. Such a reservation would make little sense if the grantors' intent was to retain fee title to the described property—if this was the intent of the conveyance, no easement benefitting the commercial parcel would be necessary.

¶20 As it is undisputed that Keyes and Radovich held fee title to portions of the described areas, and the unambiguous language of the deed makes clear that the intent of the grantors was to convey all of their interest in this land, the deed was sufficient to convey fee title. Indeed, the trial court recognized that the quitclaim deed "purports to convey fee simple title" to NYBA.

¶21 Nevertheless, Seattle Boat contends that, pursuant to our Supreme Court's decision in *Kershaw Sunnyside Ranches, Inc. v. Yakima Interurban Lines Ass'n*, 156 Wn.2d 253, 126 P.3d 16 (2006), a court must always consider extrinsic evidence when determining the intent of the parties to a deed.[6] Initially, we note that *Kershaw* involved a deed for a railroad right-of-way—an area of law that has long received unique treatment by Washington courts. 1 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK SERIES: REAL ESTATE ESSENTIALS § 5.8(2) (4th ed. 2009) (noting that railroad right-of-way cases constitute an exception to

---

[6] In *Kershaw*, the court noted that "[e]ven absent ambiguity, this court, unlike in statutory or contract construction cases, has consistently examined the circumstances surrounding the transfer and subsequent conduct of the parties, regardless of ambiguity, if helpful in ascertaining the parties' intent, which is 'of paramount importance.' " 156 Wn.2d at 272 n.15 (quoting *Brown v. State*, 130 Wn.2d 430, 437-38, 924 P.2d 908 (1996)).

the general rules of deed construction); *see Brown v. State*, 130 Wn.2d 430, 436-37, 924 P.2d 908 (1996) (observing that decisions regarding railroad rights-of-way are "in considerable disarray and usually turn on a case-by-case examination of each deed"). Moreover, although our Supreme Court has, on three occasions, observed that surrounding circumstances may be considered in the absence of ambiguity when determining the intent of the parties to a railroad deed,[7] the court has never seen fit to apply this principle outside of the context of railroad right-of-way cases.[8]

¶22 Indeed, just one year before *Kershaw*, in a case that did not involve a railroad deed, the court explained that Washington law requires that the intent of the parties be determined from the unambiguous language of the document itself. In *Niemann v. Vaughn Community Church*, the court reaffirmed that " '[t]he intent of the parties is to be derived from the entire instrument and, *if ambiguity exists*, the situation and circumstances of the parties at the time of the grant are to be considered.' "[9] 154 Wn.2d 365, 374, 113 P.3d 463 (2005) (emphasis added) (quoting *Harris v. Ski Park Farms, Inc.*, 120 Wn.2d 727, 739, 844 P.2d 1006 (1993)). More recently, in *Kiely v. Graves*, the court explained that where an interest in land is dedicated to a city

---

[7] *Kershaw*, 156 Wn.2d at 270 n.12; *Brown*, 130 Wn.2d at 438; *Harris v. Ski Park Farms, Inc.*, 120 Wn.2d 727, 742-43, 844 P.2d 1006 (1993); *see also Roeder Co.*, 102 Wn. App. at 53.

[8] Although the court's decision in *Kershaw* primarily concerned the interpretation of a railroad deed, the court also considered whether a quitclaim deed from a mother to son that excepted an existing right-of-way for a railroad was intended to convey the mother's own interests in the right-of-way. 156 Wn.2d at 272. It was in this context that the court stated, in dicta, that the extrinsic evidence can be considered in the absence of ambiguity. However, because the court determined that the deed at issue was, in fact, ambiguous, the court did not rely on this principle in deciding the case before it.

[9] Similarly, in *Sunnyside Valley*, a case that also did not involve a railroad deed, the Supreme Court felt it necessary to correct the Court of Appeals for stating that the intent of the parties regarding an easement should be determined from "the circumstances surrounding the grant." *Sunnyside Valley Irrigation Dist. v. Dickie*, 111 Wn. App. 209, 214-15, 43 P.3d 1277 (2002). To the contrary, the court explained, "[i]f the plain language [of the deed] is unambiguous, extrinsic evidence will not be considered." *Sunnyside Valley*, 149 Wn.2d at 880.

by the presentment of a plat, the grantor's intent must be determined "from the plat itself." 173 Wn.2d 926, 932-33, 271 P.3d 226 (2012) (citing *Frye v. King County*, 151 Wash. 179, 182, 275 P. 547 (1929)). In none of these three cases— *Niemann*, *Kershaw*, and *Kiely*—did the Supreme Court indicate that it was adopting a new rule of construction or departing from prior precedent. Thus, viewed as a whole, the cases confirm that the court—in deciding cases—has continued to adhere to its rule that a deed must be ambiguous before extrinsic evidence is properly considered, at least outside of the discrete subset of cases interpreting railroad right-of-way interests.

¶23 However, even if Seattle Boat is correct in contending that extrinsic evidence was properly considered by the trial court, the extrinsic evidence adduced at trial fails to demonstrate that the 1981 quitclaim deed was intended to convey anything less than fee title. Indeed, the only testimony of the parties to the transaction was that the quitclaim deed was intended to convey fee title. Radovich, the grantor of the deed, testified that he intended to convey "all of the interest we had" in the described property. Alan Lang, the president of NYBA at the time the quitclaim deed was executed, likewise testified that he understood the deed to be a conveyance of fee title.

¶24 Of even greater significance is the fact that the purposes for which a court may properly consider extrinsic evidence pursuant to our state's context rule are limited. As our Supreme Court has explained, a trial court may not consider:

- Evidence of a party's unilateral or subjective intent as to the meaning of a . . . word or term;
- Evidence that would show an intention independent of the instrument; or
- Evidence that would vary, contradict or modify the written word.

*Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 695, 974 P.2d 836 (1999); *see also Bloome v. Haverly*, 154 Wn. App. 129, 138-39,

225 P.3d 330 (2010). "Extrinsic evidence is to be used to illuminate what was written, not what was intended to be written." *Hollis*, 137 Wn.2d at 697.

¶25 Here, the trial court improperly relied on extrinsic evidence to contradict the written words of the quitclaim deed. The court explained that the real estate excise tax affidavit filed by NYBA's vice president—stating that the quitclaim deed was a "document in correction of easements"—"confirmed" that the deed was intended merely to correct the declaration of easements previously issued by Radovich and Keyes.[10] Similarly, the court found that references in the meeting minutes of the NYBA board of directors to the acquirement of "easements" through quitclaim deeds indicated that the intent of the deed was not to convey fee title but to grant easements.[11] However, the 1981 quitclaim deed contains no reference to either a conveyance or correction of easements. Instead, the deed clearly documents the intent of the grantors to convey all ownership interest in the three easement areas—the "described real estate . . . together with all after acquired interest." Accordingly, it was impermissible for extrinsic evidence to be relied upon in divining an intent in the grantors to convey something less than their entire interest in the land, as

[10] The vice president's characterization of the deed, of course, could have no legal effect on the validity of the quitclaim deed, which took effect upon its delivery to NYBA. *See, e.g., Hampton v. Gilleland,* 61 Wn.2d 537, 545, 379 P.2d 194 (1963). Furthermore, it is unclear whether the vice president's characterization can be imputed to NYBA as evidence of the association's intent regarding the nature of the estate granted. Although the vice president acted as an agent of NYBA in *recording* the deed, there was no evidence that he had any knowledge regarding the details of the *transaction* itself. Moreover, the vice president's description of the deed is itself ambiguous. It is possible that the use of the phrase "correction of easements," simply reflected the vice president's understanding that the property had been subject to easements prior to its conveyance.

[11] The trial court explained that its finding of intent was further reinforced by the grantors' continued payment of property taxes, the failure of NYBA to amend its condominium declaration to reflect acquisition of the parcels, the lack of consideration paid by NYBA, and the absence of a purchase and sale agreement. Significantly, the court made no mention of the language of the deed itself, noting merely that "the Quit Claim Deed purports to convey fee simple title." Nor did the court explain why a quitclaim deed would be necessary to grant easements that were already held by NYBA.

such evidence clearly contradicted the words of the deed. Similarly, extrinsic evidence was not properly relied upon to conclude that the quitclaim deed was intended as a correction of easements, as such an intention would be entirely independent of the instrument.

¶26 The trial court erred by relying on extrinsic evidence to determine that which it believed the parties "intended to be written." *Hollis*, 137 Wn.2d at 697. Because the words of the deed unambiguously document the intent of the grantors to convey their entire ownership interest in the described land, the 1981 quitclaim deed constitutes a valid conveyance of fee simple title.

### III

¶27 NYBA next contends that the trial court erred by determining that, because Keyes and Radovich failed to comply with statutory and local requirements governing the subdivision of real property, the quitclaim deed constitutes an "illegal and unenforceable conveyance." We agree.

¶28 As an alternative basis for decision, the trial court ruled that the deed was unenforceable because Radovich and Keyes did not comply with statutory procedures for subdividing property. At the time the quitclaim deed was executed, former RCW 58.17.060 (1974) provided that "[t]he legislative body of a city . . . shall adopt regulations and procedures . . . for the summary approval of short plats and short subdivisions, or revision thereof." The Bellevue City Code set forth multiple requirements on short subdivision applicants. Failure to comply with such provisions constitutes a misdemeanor. RCW 58.17.300. It is undisputed that Radovich and Keyes did not comply with these requirements prior to execution of the quitclaim deed.[12] Accord-

---

[12] RCW 58.17.040(6) exempts boundary line adjustments from the requirements of state and local subdivision regulations. NYBA asserts that, because the quitclaim deed did not create new lots or reduce the commercial parcel below the minimum building site size, this conveyance constituted a boundary line adjust-

ingly, the trial court concluded that it could not "condone such conduct by enforcing the Quit Claim Deed."

¶29 As an initial matter, the trial court's reliance on *Berg v. Ting*, 125 Wn.2d 544, 886 P.2d 564 (1995), and *Dickson v. Kates*, 132 Wn. App. 724, 133 P.3d 498 (2006), for the proposition that a deed is "void on its face for failing to comply with statutory requirements" is misplaced. In each of these cases, the court held that a deed was unenforceable because it lacked a property description sufficient to satisfy the statute of frauds. Neither case stands for the more general proposition, asserted by Seattle Boat, that a deed is unenforceable because it fails to comply with some other statutory or local regulatory requirement.

¶30 Moreover, the trial court's ultimate conclusion—that a deed issued in violation of the provisions of chapter 58.17 RCW is unenforceable—is irreconcilable with that statutory scheme. Although RCW 58.17.210 provides that certain permits may not be issued on illegally subdivided property, this section exempts an innocent purchaser from these consequences, indicating that, at minimum, such purchases are permissible.[13] Furthermore, this section stipulates that any purchaser—innocent or not—may recover damages incurred as a result of buying land that has been subdivided in violation of either state or local regulations. RCW 58.17.210. Alternatively, the purchaser may choose to "rescind the sale or transfer and recover costs . . . occasioned thereby." RCW 58.17.210. A statutory scheme that leaves the choice of remedies to the discretion of the purchaser

ment and did not violate either statutory or local provisions. The trial court, however, determined that the intent of the deed was "not an attempt to make a boundary line adjustment of any kind." Because, even assuming the existence of a violation of the subdivision regulations, the trial court erred by determining that the deed could not be enforced on this basis, we need not address this alternative argument.

[13] Seattle Boat contends that, as the drafter of the quitclaim deed, NYBA is not an "innocent purchaser" and, thus, may not benefit from this exemption. However, it is immaterial whether NYBA was, in fact, an innocent purchaser; what matters for purposes of NYBA's appeal is that the statutory scheme contemplates that illegally subdivided property may be bought and sold.

clearly contemplates that illegally subdivided land may be bought and sold. Moreover, if, as the trial court determined, such transfers could be voided at the request of a third party, the purchaser would be deprived of these statutory remedies. Such an outcome would undermine the legislature's statutory scheme governing the regulation of subdivisions.

¶31 The legislature's determination that a purchaser may elect a remedy in an action against the seller of illegally subdivided land is irreconcilable with the trial court's determination that the deed was—as a matter of law—unenforceable. The court erred by determining that, because the quitclaim deed resulted in an illegal subdivision, the deed could not be enforced.

## IV

¶32 NYBA next contends that the trial court erred by determining that, because NYBA is an unincorporated association, it could not take title to the property conveyed and, thus, that the quitclaim deed is void. We agree.

¶33 As Seattle Boat points out, at common law, unincorporated associations could not legally hold title to real property. 2 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 32.5(6) (3d ed. 1996) ("Generally it has been held that unincorporated associations . . . cannot hold title to real property because they are not legal entities."). However, this does not mean that a conveyance to such an association is unenforceable. Instead, because property titled in the name of an unincorporated association belongs to its members, the legal effect of a conveyance to an unincorporated association is that the property is owned by the association's members. *See* 6 AM. JUR. 2D *Associations and Clubs* § 12 (2008) ("[T]he legal effect of a gift to a voluntary, unincorporated association is a gift to its individual members."); 2 WASH. STATE BAR ASS'N, *supra*, at § 32.5(6) (noting that real property owned by unincorporated associations is "generally recognized as belonging to the members of the association").

¶34 Here, it is undisputed that NYBA is an unincorporated association.[14] Accordingly, the real estate described in the quitclaim deed and conveyed to NYBA is owned by the condominium members as tenants in common. The trial court erred by concluding, as a matter of law, that a deed conveying real property to an unincorporated association is unenforceable.[15]

## V

¶35 NYBA next contends that the trial court erred by determining that the quitclaim deed is unenforceable because NYBA's declaration was not "amended to include a description of the common areas and facilities." We agree.

¶36 Pursuant to the Horizontal Property Regimes Act, chapter 64.32 RCW, a condominium declaration must describe a condominium's common areas. RCW 64.32.090(4). However, Seattle Boat points to no authority indicating that the failure of a declaration to properly reflect the acquisition of such property actually limits the validity of the property's conveyance.[16] On appeal, Seattle Boat contends

---

[14] Because NYBA was formed prior to 1990, it is governed by the Horizontal Property Regimes Act, under which it is permissible for condominium associations to be unincorporated. Ch. 64.32 RCW. All post-1990 condominium associations are governed by the Washington Condominium Act and must be incorporated. RCW 64.34.300.

[15] The trial court's conclusion that the quitclaim deed "constitutes an illegal and unenforceable conveyance of real property [because NYBA is] an unauthorized 'trustee' of a non-existent trust" also finds no support in the law. Although the quitclaim deed describes NYBA as a "trustee for the benefit of the Apartment Owners," because the legal effect of the conveyance to NYBA is that the condominium owners hold the property as tenants-in-common, it makes no difference whether this language was sufficient to establish a valid trust. Indeed, Seattle Boat makes no effort to defend the trial court's conclusion of law on appeal.

[16] NYBA asserts that, because the Washington Condominium Act (WCA), chapter 64.34 RCW, provides that an "insignificant failure" of the declaration to describe a common area does not impair title to units or common elements, RCW 64.34.208, NYBA's failure to amend its declaration cannot require that the deed be set aside. However, although this provision of the WCA is applicable to pre-1990

that the purpose of this requirement is to put "the world on notice [regarding an association's] understanding of land ownership," and that, because NYBA failed to do so, Seattle Boat took superior title to the easement areas by recording its deed to the commercial parcel. However, this assertion ignores the fact that NYBA recorded the 1981 quitclaim deed. Washington's recording act is a "race-notice" statute, and the recording of a deed "imparts constructive notice of the estate or interest acquired to all subsequent purchasers, whether or not they are bona fide purchasers for value and whether or not they have actual notice of the conveyance." 2 WASH. STATE BAR ASS'N, *supra*, at § 32.6(3), at 32-34, 35 (citing *Biles-Coleman Lumber Co. v. Lesamiz*, 49 Wn.2d 436, 438, 302 P.2d 198 (1956)); *see also Alby v. Banc One Fin.*, 156 Wn.2d 367, 371, 128 P.3d 81 (2006) (observing that, where earlier deed was recorded, subsequent purchaser of land was on notice of restrictions in earlier deed). Accordingly, Seattle Boat had constructive notice that the easement areas had previously been conveyed.

¶37 Seattle Boat has advanced no reasonable basis for us to conclude that the failure to amend a condominium declaration to reflect a conveyance of real property invalidates that conveyance. The proper remedy is for NYBA's declaration to be amended. The trial court erred by determining, as a matter of law, that the deed was unenforceable for this reason.

VI

¶38 NYBA next asserts that the trial court erred by concluding that the association lost its right to seek enforcement of the quitclaim deed based upon the equitable doctrines of laches and equitable estoppel. We agree.

¶39 Laches is an equitable defense that is based on estoppel. *Real Progress, Inc. v. City of Seattle*, 91 Wn.

condominiums, it applies only with respect to events and circumstances occurring after July 1, 1990. RCW 64.34.010. As the quitclaim deed was recorded in 1981, the provision does not apply in this case.

App. 833, 843-44, 963 P.2d 890 (1998).[17] The doctrine applies when the defendant affirmatively establishes "(1) knowledge by plaintiff of facts constituting a cause of action or a reasonable opportunity to discover such facts; (2) unreasonable delay by plaintiff in commencing an action; and (3) damage to defendant resulting from the delay in bringing the action." *Davidson v. State*, 116 Wn.2d 13, 25, 802 P.2d 1374 (1991). "To constitute laches there must not only be a delay in the assertion of a claim but also some change of condition must have occurred which would make it inequitable to enforce it." *Waldrip v. Olympia Oyster Co.*, 40 Wn.2d 469, 477, 244 P.2d 273 (1952). "[W]hen asserted in opposition to the interest of a landowner, [laches] must be proved by clear and convincing evidence." *Arnold v. Melani*, 75 Wn.2d 143, 148, 449 P.2d 800, 450 P.2d 815 (1968). The question of whether a particular case is one to which a grant of equitable relief, in some form, is appropriate is subject to de novo review. *Niemann*, 154 Wn.2d at 374.

¶40 Here, the trial court determined that NYBA had unreasonably delayed the commencement of its quiet title action because "for decades" it failed to seek judicial enforcement of the quitclaim deed or to "assert any ownership" over the property described therein. However, the evidence adduced at trial indicates that NYBA and Mercer Marine, Seattle Boat's predecessor in interest, generally co-existed in peace, and that legal action was therefore unnecessary prior to Seattle Boat's acquisition of the commercial parcel.[18] Nevertheless, Seattle Boat asserts that NYBA was required to raise a claim of fee title ownership in

---

[17] "Laches has been applied by Washington courts since 1894." Deane W. Minor, Recent Development, Hayden v. City of Port Townsend, *93 Wn.2d 870, 613 P.2d 1164 (1980)*, 56 WASH. L. REV. 549, 554 (1981) (citing *Rigney v. Tacoma Light & Water Co.*, 9 Wash. 576, 38 P. 147 (1894)).

[18] NYBA did, at times, assert its property rights against Burbridge. In 1987, NYBA's attorney wrote a letter informing Burbridge that a building owned by Mercer Marine encroached onto a portion of NYBA's property. The encroachment was located on a portion of the land described in the quitclaim deed. The letter gave NYBA's permission to leave the building on the property, and Burbridge later testified that he took no action in response to receiving the letter.

2004, when Burbridge proposed a redevelopment project that would involve a reconfiguration of the easement areas described in the quitclaim deed. However, NYBA never agreed to that project, and Burbridge did not, in fact, proceed with his plans for redevelopment. Accordingly, there is no evidence that NYBA ever unreasonably delayed legal action during the period prior to Seattle Boat's acquisition of the commercial parcel—Burbridge's conduct simply did not give rise to a dispute requiring the commencement of legal action.

¶41 Seattle Boat nevertheless contends that NYBA unreasonably delayed legal action in the periods just before and subsequent to its purchase of the commercial parcel. One month prior to the sale, Alan Bohling, Seattle Boat's president, met with the Kyle Anderson, the president of the NYBA board, to discuss Seattle Boat's general redevelopment plan. Although Bohling provided no specifics of the plan, because the parties discussed the demolition of a NYBA-owned structure within parcel B, Seattle Boat asserts that NYBA was required to bring an action to quiet title at that time. However, Bohling himself testified that, while such a discussion took place, the parties also discussed moving NYBA's offices into a new building to be constructed on the commercial parcel to ameliorate the impact of the demolition. Because this plan offered a substantial benefit to NYBA, and because the plan was never finalized, it was not shown by clear and convincing evidence that NYBA should have known it had a cause of action against Seattle Boat at that time.

¶42 Indeed, discussions between Seattle Boat and NYBA regarding the redevelopment plan continued in the period after Seattle Boat closed on the property. Although Anderson "steadfastly" maintained the position that NYBA had exclusive use of the areas described in the quitclaim deed, his discussions with Bohling continued to be "constructive and amiable conversations where I felt that [Bohling] really got what our concerns were and was willing and open to

working towards a resolution." Bohling likewise testified that these discussions proceeded in "a great spirit of cooperation." Indeed, it was only when Seattle Boat indicated its unwillingness to accommodate NYBA's parking concerns—at some time soon after NYBA's February 2008 board meeting—that Anderson realized the parties had encountered a "major, major sticking point."

¶43 Until that time, NYBA could reasonably have believed that any dispute with Seattle Boat could be resolved without resort to litigation. Laches cannot apply where a plaintiff has no reason to believe that legal action is necessary. *See Assocs. Hous. Fin. LLC v. Stredwick*, 120 Wn. App. 52, 62, 83 P.3d 1032 (2004). As NYBA commenced this lawsuit on September 9, 2008, only seven months passed between the time when NYBA should first have determined that litigation might be necessary and the time that it actually brought suit against Seattle Boat. Such a delay does not support the application of laches. *Compare Gardner v. Herbert*, 165 Wash. 429, 434, 5 P.2d 782 (1931) (holding no laches where husband permitted divorced wife to use land for 15 months after receiving deed), *with Davidson*, 116 Wn.2d at 26-27 (holding that 62-year delay in bringing claim supports application of laches to bar claim).

¶44 Nor do the facts of this case support the trial court's application of equitable estoppel. The elements of equitable estoppel are (1) an act or omission by the first party, (2) an act by another party in reliance on the first party's act, and (3) an injury that would result to the relying party if the first party were not estopped from repudiating the original act. *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 743, 863 P.2d 535 (1993). This doctrine is not favored and must be proved by clear, cogent, and convincing evidence. *Robinson v. City of Seattle*, 119 Wn.2d 34, 82, 830 P.2d 318 (1992). Moreover, our Supreme Court has explained that "mere silence or acquiescence will not operate to work an estoppel where the other party has

constructive notice of public records which disclose the true facts." *Waldrip*, 40 Wn.2d at 476. "Where the parties have equal means of knowledge there can be no estoppel in favor of either." *Waldrip*, 40 Wn.2d at 476.

¶45 Here, the quitclaim deed was recorded in 1981. Accordingly, Seattle Boat had constructive knowledge of NYBA's ownership of the easement areas.[19] *See Biles-Coleman Lumber Co.*, 49 Wn.2d at 438. Because the public record discloses "the true facts," *Waldrip*, 40 Wn.2d at 476, there can be no estoppel in favor of Seattle Boat. Indeed, Seattle Boat makes no effort to defend this conclusion of law on appeal. The trial court erred by applying the doctrines of laches and equitable estoppel in determining that the deed was unenforceable.

## VII

¶46 NYBA next contends that the trial court erred by concluding that the quitclaim deed must be set aside based upon a lack of consideration in the conveyance from Radovich and Keyes to NYBA in 1980. For several reasons, we agree.

¶47 First, as a threshold matter, a stranger to a contract may not challenge the contract's validity based on inadequate consideration. Because consideration constitutes the heart of the parties' bargain, this defense to a contract is personal to the contracting parties. *See, e.g., Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 265 Neb. 133, 138, 655 N.W.2d 390 (2003) (" '[T]he fact that a third party would be better off if a contract were unenforceable does not give him standing to sue to void the contract.' " (quoting *In re Vic Supply Co.*, 227 F.3d 928 (7th Cir. 2000))). Here, neither NYBA nor Radovich—the parties to the 1980 transaction

---

[19] In addition, as NYBA points out, the association neither committed an act nor made any omission that could give rise to a reasonable belief that Seattle Boat would own the easement areas in fee simple following its purchase of the commercial parcel. At no point did NYBA agree to Seattle Boat's unfettered use of the easement areas.

that resulted in the 1981 recording of the quitclaim deed—challenged the conveyance of the deed based upon an asserted lack of consideration. The trial court erred by determining that the quitclaim deed must be set aside on this basis.

¶48 Second, setting aside the quitclaim deed constitutes a form of rescission. Thus, if the trial court was cancelling the contract of conveyance by declaring the deed unenforceable (hence ruling that title never left Radovich and Keyes in favor of NYBA), *restitution* of the purchase price was a necessary corollary to this ruling. The parties *never* addressed or considered this issue and, needless to say, the trial court, as a result, never made any finding on the matter. NYBA could not rightly be deprived of the benefit of its bargain without a resultant return to it of the purchase price. But, here, that happened. This was error.

¶49 Third, calculating the amount of restitution would have been nigh impossible—making rescission an inappropriate remedy. Here, as explained more fully below, part of the consideration that Radovich and Keyes received from NYBA was NYBA's forbearance from suing them for providing parking in an amount less than the law required. In this regard, the conveyance of the quitclaim interest operated, in part, as an accord and satisfaction of that claim. By 2004, Radovich and Keyes had accepted—and consumed—over two decades of this benefit. No way exists for a trial court to order them to disgorge this benefit back to the purchaser (NYBA) as part of rescinding the contract of sale of the land described in the quitclaim deed. Thus, the remedy sought (by a stranger to the contract)—rescission of the contract of sale and restoration of the parties to their precontract status—was impossible to grant, even if it had been requested by an entity with standing to make such a request.

¶50 Fourth, the evidence presented on the question of lack of consideration was not of a type that would allow for a court to order rescission (as opposed to compensatory

damages). Seattle Boat's claim—in large part—rested on its assertion that NYBA did not follow through with its promise to pay all future taxes on the property. For a century, it has been the law of this state that such a claim does not support rescission as a remedy. *Hewett v. Dole*, 69 Wash. 163, 170, 124 P. 374 (1912). Once title has transferred, failure to pay further sums owing does not constitute failure of consideration in the formation of a contract—it constitutes a breach of the contract. The appropriate remedy is an award of damages. *Hewett*, 69 Wash. at 170. Only by proving fraud in the inception of the contract would a vendor have a right to rescission as a remedy. *Hewett*, 69 Wash. at 169-70. However, there is "no authority holding that a preconceived intention not to perform is established merely by a subsequent failure or refusal to perform." *Hewett*, 69 Wash. at 170. Thus, the evidence presented was not of a type that could lend itself to supporting an order rescinding the sale.

 ¶51 Finally, the evidence presented at trial—as a whole—does not establish a lack of consideration. As our Supreme Court has long recognized, "[g]enerally speaking, inadequacy of price is not sufficient, standing by itself, to authorize a court of equity to set aside a deed." *Downing v. State*, 9 Wn.2d 685, 688, 115 P.2d 972 (1941). Only where the inadequacy of consideration for conveyance of realty is so great as to shock the conscience may a court invoke its equitable power to set aside the conveyance. *Downing*, 9 Wn.2d at 688; *see also Binder v. Binder*, 50 Wn.2d 142, 150, 309 P.2d 1050 (1957). However, quitclaim deeds are commonly used in transactions that are not the result of a sale for value. 17 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 7.2, at 472 (2d ed. 2004). Such instruments are "used in donative transactions, in which, despite the recital of consideration in the deed, no actual consideration passes except perhaps love and affection." 17 STOEBUCK & WEAVER, *supra*, § 7.2, at 472. Similarly, quitclaim deeds are often used "to clear title, to

correct errors in prior deeds, and to adjust disputed boundaries between adjoining landowners." 17 STOEBUCK & WEAVER, *supra*, § 7.2, at 472. In such circumstances, "the common practice in Washington . . . to recite consideration of 'ten dollars and other good and valuable consideration' is sufficient to support a conveyance by deed." 17 STOEBUCK & WEAVER, *supra*, § 7.7, at 483.

¶52 Here, the quitclaim deed recited as consideration "Ten . . . Dollars, and other good and valuable consideration." As an initial matter, the trial court's determination that "no consideration was provided to Radovich and Keyes in exchange for the Quit Claim Deed" is not supported by substantial evidence. The undisputed evidence at trial indicates that, at a minimum, NYBA paid back taxes on the easement areas for the years of 1978, 1979, and 1980. Nevertheless, Seattle Boat contends that the recited dollar amount—even when coupled with NYBA's payment of the back taxes—is so inadequate as to shock the conscience. This assertion, however, ignores the fact that Radovich and Keyes had provided NYBA with far less parking than promised or required by law.[20] Conveying fee title to the easement areas was one attempt to remedy this situation and, thus, to avoid litigation between NYBA and Radovich. Given the purposes for which the deed was executed, and recognizing that at least some consideration was given, the consideration for the deed was not so inadequate as to shock the conscience. The trial court erred by concluding to the contrary.[21]

---

[20] The local codes required 208 parking spaces, but the developers obtained approval for a plan with only 187 spaces. Nevertheless, only 123 spaces were provided.

[21] Because the quitclaim deed is both valid and enforceable, we need not reach NYBA's contention that the trial court erred by determining that NYBA's easement rights were nonexclusive. Similarly, we do not address whether the trial court erred by finding that Seattle Boat's activities did not overburden NYBA's easements.

## VIII

¶53 NYBA contends, finally, that the trial court erred by concluding that Mercer Marine, Seattle Boat's predecessor in interest, acquired a narrow strip of frontage property and a vault located within parcel B by way of adverse possession. We disagree.

¶54 Adverse possession requires possession that was (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile for the statutory 10-year period. *Chaplin v. Sanders*, 100 Wn.2d 853, 857, 676 P.2d 431 (1984). "Hostility . . . 'does not import enmity or ill-will, but rather imports that the claimant is in possession as owner, in contradistinction to holding in recognition of or subordination to the true owner.' " *Chaplin*, 100 Wn.2d at 857-58 (quoting *King v. Bassindale*, 127 Wash. 189, 192, 220 P. 777 (1923)).

¶55 Without citation to the record, NYBA asserts that Mercer Marine's use of the frontage property and vault was permissive and not hostile. However, the trial court's factual findings with regard to this issue are well supported by substantial evidence. There was ample evidence adduced at trial indicating that Mercer Marine made use of these areas as would a true owner. Moreover, NYBA points to no evidence in the record indicating that it ever consented to Mercer Marine's use of the frontage area or the vault. Because the necessary elements of adverse possession are established by these findings of fact, the court did not err by concluding that Seattle Boat, as successor in interest to Mercer Marine, acquired these portions of NYBA's property by adverse possession.[22]

---

[22] NYBA also contends that it acquired an easement to cross the commercial parcel in order to access the areas described in the quitclaim deed. At trial, NYBA asserted that it acquired an easement by prescription but did not contend that it acquired an easement by prior use or necessity. Absent manifest constitutional error, this court does not consider a theory raised for the first time on appeal. RAP

¶56 We reverse the trial court's determinations that the quitclaim deed did not convey fee title and that the deed was unenforceable. We affirm the court's determination that Seattle Boat acquired portions of NYBA's property through adverse possession.

LEACH, C.J., and ELLINGTON, J., concur.

---

2.5(a); *see Brown v. Labor Ready Nw., Inc.*, 113 Wn. App. 643, 655, 54 P.3d 166 (2002). Accordingly, we do not address this issue.