IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2018 MAR 19 AM 10: 28

| | | |
|---|---|---|
| CAMERON PELLY and AMY PELLY, husband and wife, | ) ) ) | No. 75517-0-I |
| Respondents, | ) ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| ANATOLIY PANASYUK and SHARON C.W. TSENG, husband and wife, | ) ) ) | |
| Appellants. | ) ) | FILED: March 19, 2018 |

SCHINDLER, J. — In this appeal, we review the trial court decision interpreting a 1970 grant of easement and quitclaim deed executed and recorded by adjoining property owners Russ and Jean Kelleran and George and Virginia Fey to resolve their dispute over rights to what is referred to as the "Waterfront Strip." In 2015, Anatoliy Panasyuk and Sharon Tseng, the successors in interest to Fey, applied for permits to install a dock and boatlift. Amy and Cameron Pelly, the successors in interest to Kelleran, sought a declaratory judgment and injunctive relief. Pelly alleged the dock, boatlift, and certain landscaping and fencing violated the rights established by the 1970 documents. Panasyuk and Tseng filed a counterclaim asserting title to the Waterfront Strip or alternatively, a declaratory judgment on the scope of the rights under the 1970 "Grant of Easement" and "Quit Claim Deed." Following trial, the court issued a 25-page

decision and extensive findings of fact and conclusions of law. The court found the parties clearly intended the Grant of Easement and Quit Claim Deed be given effect. The court interpreted the Grant of Easement and Quit Claim Deed together and ruled the dock, boatlift, some fencing, and portions of the hedge and potted shrubs violated the right to prohibit permanent structures on the Waterfront Strip and materially interfered with the easement rights. The court issued an injunction prohibiting Panasyuk and Tseng from interfering with the right to ingress and egress to the Waterfront Strip for foot traffic and hand-carried boat access. On appeal, Panasyuk and Tseng argue the court erred in admitting extrinsic evidence to determine the intent of the original parties in executing and recording the Grant of Easement and Quit Claim Deed. Panasyuk and Tseng contend the language of the Quit Claim Deed eliminated all rights to ingress and egress. We hold the court did not err in considering extrinsic evidence to determine the intent of the original parties and whether the recorded Grant of Easement and Quit Claim Deed were part of the same transaction and interpreting the two documents together to give effect to the right to ingress and egress, and affirm.

Grant of Easement and Quit Claim Deed

The unchallenged findings establish the following facts. In 1953, C.R. (Russ) and Jean Kelleran (Kelleran) purchased Lake Sammamish waterfront property in Bellevue. George and Virginia Fey (Fey) owned the adjacent property to the east of the Kelleran property.

On March 20, 1969, Fey filed a lawsuit to quiet title to a 30-feet-wide by approximately 300-feet-long strip of land that runs north to the lakeshore, the Waterfront

Strip. Kelleran filed a counterclaim asserting title to the Waterfront Strip. The following exhibit shows the location of the Kelleran and Fey property and the Waterfront Strip:



The parties agreed to resolve the lawsuit by executing a Grant of Easement and a Quit Claim Deed. On November 23, 1970, Fey executed an easement granting Kelleran the right to "ingress and egress, for foot traffic and boat access purposes only," and the right to prohibit placing any "permanent structure of any kind" on the Waterfront Strip. The Grant of Easement states the 30-foot Waterfront Strip includes "the Lake Sammamish Shore lands adjacent."

The Grant of Easement recorded on December 29, 1970 provides, in pertinent part:

> THE GRANTORS, GEORGE C. FEY and VIRGINIA L. FEY, husband and wife, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, hereby give, grant and convey to C. R. KELLERAN and JEAN B. KELLERAN, husband and wife,

as grantees, and to their heirs, successors and assigns forever, a right of way for purposes of ingress and egress, for foot traffic and boat access purposes only, over and upon the following described real estate situate in King County, Washington . . . :

> A strip of land 30 feet in width, being a portion of Government Lot 2 in Section 13, Township 24 North, Range 5 E.W.M., King County, Washington . . . [.]

> . . . TOGETHER WITH the Lake Sammamish Shore lands adjacent . . . .

TOGETHER with the right to prohibit the placing of any road or other permanent structure of any kind upon the aforedescribed property, except that such right shall not apply to existing structures. This right shall be interpreted as and is intended to be a covenant running with the land for the benefit of the property of the grantees which lies adjacent to and westerly of the property described in this instrument and as a burden upon that portion of the property described in this instrument which said right touches and concerns.

On December 23, 1970, Kelleran executed the Quit Claim Deed that conveyed to Fey any interest to the Waterfront Strip, "including any interest therein which grantors may thereafter acquire," subject to "the right to prohibit the placing of any road or other structure of any kind" on the Waterfront Strip. The Quit Claim Deed was recorded on December 31, 1970 and provides, in pertinent part:

> THE GRANTORS, C. R. KELLERAN and JEAN B. KELLERAN, husband and wife; DONALD E. CHANDLER, a single man; and ELIZABETH A. JOHNSON, individually and as executrix of the Estate of Howard B. Johnson, deceased, for and in consideration of One Dollar ($1.00) and other valuable consideration, convey and quit claim to GEORGE C. FEY and VIRGINIA L. FEY, husband and wife, the following described real estate, situated in the County of King, State of Washington, including any interest therein which grantors may hereafter acquire:

> A strip of land 30 feet in width, being a portion of Government Lot 2 in Section 13, Township 24 North, Range 5 E.W.M., King County, Washington . . . [.]

> . . . TOGETHER WITH the Lake Sammamish shore lands adjacent.

RESERVING TO THE GRANTORS, HOWEVER, And to their heirs, successors and assigns forever, the right to prohibit the placing of any road or other structure of any kind upon that portion of the aforedescribed property which lies northerly of a line which is the extension of the northern boundary of lots 21 and 8, Block 3, of the unrecorded plat of Strandvik, a corporation, except that such right shall not apply to existing structures. This right shall be interpreted as and is intended to be a covenant running with the land for the benefit of the property of the grantors which lies adjacent to and westerly of the property conveyed by this instrument, and as a burden upon that portion of the property conveyed by this instrument which said right touches and concerns.

The undisputed evidence shows that after executing the two documents, Kelleran used the Waterfront Strip for ingress and egress and boat access. In 1999, Bruce and Rebecca Kelleran built an "auxiliary dwelling unit" on the property for Russ and Jean. In 2000, Bruce and Rebecca demolished the summer cabin and built a 5,000-square-foot house.

In 2005, Anatoliy Panasyuk and Sharon C.W. Tseng purchased the Fey property. The "Statutory Warranty Deed" expressly conveys title to Panasyuk and Tseng **"SUBJECT TO: RIGHTS, RESERVATIONS, COVENANTS, CONDITIONS, RESTRICTIONS, AGREEMENTS AND EASEMENTS PRESENTLY OF RECORD AND AS SET OUT ON EXHIBIT 'A' ATTACHED."**[1] Exhibit A identifies the 1970 Grant of Easement and Quit Claim Deed. The Statutory Warranty Deed states the Grant of Easement gives the adjacent property owner the right to "[i]ngress and egress, for foot traffic and boat access purposes only," to the 30-foot Waterfront Strip.

EASEMENT AND CONDITIONS CONTAINED THEREIN, AS GRANTED/RESERVED/DISCLOSED/CONTAINED BY INSTRUMENT:
Recorded:          December 29, 1970
Recording No.:     6727744
Purpose:          Ingress and egress, for foot traffic and boat access purposes only

---

[1] Boldface in original.

Affects:        The East 30 feet of said Government Lot 2, except that portion lying South of a line which is the extension of the Northerly line of Lots 21 and 8, Block 3, of the unrecorded Plat of Standvick [sic] Addition, a corporation.

The Statutory Warranty Deed states the Quit Claim Deed prohibits "the placing of any road or other structure of any kin[d] upon" the Waterfront Strip.

RESERVATIONS AND/OR EXCEPTIONS CONTAINED IN INSTRUMENT:

From:        C.R. Kelleran and Jean B. Kelleran, his wife, Donald E. Chandler, a single man, Elizabeth A. Johnson, individually and as executrix of the estate of Howard B. Johnson, deceased

Recorded:        December 31, 1970

Recording No.:        6728558

As Follows:        Reserving to the Grantor's [sic] and to the heirs, successors and assigns forever, the right to prohibit the placing of any road or other structure of any king [sic] upon that portion of the East 30 feet of said Government Lot 2, which lies Northerly of a line which is the extension of the Northern Boundary of Lots 21 and 8, Block 3, of the unrecorded Plat of Strandvick, a corporation, except that such right shall not apply to existing structures.

On May 25, 2005, an attorney representing Panasyuk and Tseng sent a letter to Kelleran. The letter acknowledges the easement rights to ingress and egress and that consistent with those rights, Panasyuk and Tseng plan to landscape and install a fence on the boundary line. The letter states, in pertinent part:

As you know, the Panasyuk & Tseng property abuts yours to the east. In addition, you have an easement across a portion of the northern panhandle of my clients' property. Such easement was granted and conveyed in the Grant of Easement recorded on December 29, 1970 and modified in the Quit Claim Deed recorded on December 31, 1970.

The scope of the easement benefiting your property is limited. Such easement only permits you to use the northern portion of my clients' panhandle for ingress and egress for pedestrian and boat access purposes.

6

. . . .

Mr. Panasyuk and Ms. Tseng intend to make certain landscaping improvements to their property, including within the panhandle. When they make such improvements, they reasonably expect that you will not interfere with or disrupt their activities and improvements. As long as my clients' improvements afford you the ability to continue to use the northern portion of their panhandle for pedestrian and boat ingress and egress, you have no legal right to challenge or dictate what they do with their property.

For your information, Mr. Panasyuk and Ms. Tseng intend to place an attractive light-duty steel fence along the west and east sides of their panhandle. To afford you the continued ability to use the easement as authorized, they will have two double-wide gates installed in areas to northeast and southeast of your residence that you will be able to swing open when necessary and close as you exit.

Although they are not required to receive your input, Mr. Panasyuk and Ms. Tseng are hereby graciously inviting you to identify where you would like them to place the two double-wide gates. If they deem your suggestion to be unreasonable, however, they reserve the right to place the gates wherever they choose.

My clients may or may not continue to have the lakeside portion of their panhandle covered with grass. They may also install a third gate to afford another access point.

Panasyuk and Tseng planted a hedge of Emerald Green arborvitae along the Waterfront Strip boundary with Kelleran and installed a black metal fence with a gate to allow ingress and egress. Panasyuk and Tseng also placed potted Emerald Greens and erected other fencing near the beach on the Waterfront Strip.

In 2010, Bruce and Rebecca Kelleran sold the house to their daughter and son-in-law Amy and Cameron Pelly (Pelly).

In 2014, Panasyuk and Tseng filed an application for a shoreline permit to "[i]nstall a Hewitt pre-manufactured freestanding dock 56 [feet] long and covering 257 [square feet]" and "[i]nstall a freestanding boatlift."

Pelly notified Panasyuk and Tseng that constructing the dock and boatlift violated the Grant of Easement—"The proposed dock and boatlift are clearly structures which are being proposed within the area encumbered by the easement." Pelly asked Panasyuk and Tseng to withdraw the city of Bellevue application and remove "obstructions," including the hedge, potted plants, and fences that "block access from the Pellys['] property to enter the 30 foot strip" for ingress and egress and "to launch watercraft."

Panasyuk and Tseng asserted the dock was not in the easement area and "the dock and boatlift are not in any sense 'permanent' " structures. As to the "shrubs in pots" and "row of shrubs planted along the property boundary," Panasyuk and Tseng stated they "were careful to leave gaps between these shrubs in a few locations to permit foot traffic."

2015 Lawsuit

On May 18, 2015, Pelly filed a complaint and declaratory judgment action. Pelly alleged the dock, boatlift, plantings, and fencing violated the Grant of Easement and Quit Claim Deed. Pelly sought a declaratory judgment and injunctive relief.

Panasyuk and Tseng filed an answer, affirmative defenses, and counterclaims. Panasyuk and Tseng asserted title to the Waterfront Strip. In the alternative, Panasyuk and Tseng sought a declaratory judgment on the scope of the Grant of Easement. Panasyuk and Tseng alleged Pelly were not entitled to the rights of ingress and egress

provided by the Grant of Easement recorded December 29, 1970 on the theory that those rights were eliminated by the Quit Claim Deed recorded two days later. Panasyuk and Tseng asserted the portable dock was not a permanent structure in the easement area, the potted plants and "small fences" were not structures, and the landscaping did not violate the Grant of Easement. Panasyuk and Tseng also asserted vehicle access over the Waterfront Strip is "not allowed under the 1970 Easement," the easement was "only intended for ingress and egress by foot traffic," boat access is limited to small hand-carried watercraft, and Kelleran and Pelly abandoned the right to launch a boat.

Cross Motions for Partial Summary Judgment

Panasyuk and Tseng filed a motion for partial summary judgment. Panasyuk and Tseng argued Pelly did not have the right to ingress and egress over the Waterfront Strip because the Quit Claim Deed reserved only the right to prohibit permanent structures. Panasyuk and Tseng argued the "portable dock is not a 'permanent structure' " within the easement area and they had the right to plant the hedge and install the fencing.

Pelly filed a cross motion for partial summary judgment. Pelly argued the dock and boatlift were located in the area described in the Grant of Easement and Quit Claim Deed, the language of the documents prohibited the dock and boatlift, and they did not abandon the right to ingress and egress.

The court ruled the legal description of the Waterfront Strip as "shore lands adjacent" includes the submerged second-class shore land adjacent to the shore. The court ruled the 1970 Grant of Easement and the 1970 Quit Claim Deed "inextricably relate in subject and chronology such that they are to be considered together." The

court found the intent of the parties, the admission of "certain extrinsic" evidence, whether the Grant of Easement and Quit Claim Deed language was ambiguous, whether the dock was a permanent structure, and whether Pelly abandoned their easement rights were material questions of fact for trial.

Trial

At trial, Pelly argued the pleadings filed in the 1970 dispute and correspondence between the parties established the intent of Kelleran and Fey to resolve the ownership dispute over the Waterfront Strip. Pelly asserted the court should interpret and give effect to the recorded Grant of Easement and Quit Claim Deed. Pelly argued the proposed dock and the hedge, potted plants, and fencing violated their right to prohibit any "structure of any kind" and the Quit Claim Deed did not eliminate the rights to ingress and egress for foot traffic and boat access.

Panasyuk and Tseng argued the proposed dock, plants, fences, shrubs, lighting, sprinkler system, and other existing property are not "permanent" structures that "interfere with any 'easement' rights or the covenant." Panasyuk and Tseng asserted the language of the Grant of Easement and the Quit Claim Deed "expresses an unequivocal intent to eliminate" the rights to ingress and egress. Panasyuk and Tseng also argued Pelly abandoned the right to use the Waterfront Strip for boat access.

Panasyuk and Tseng filed a motion in limine objecting to the admission of extrinsic evidence related to the 1970 dispute and the Grant of Easement and Quit Claim Deed. Panasyuk and Tseng argued the evidence was inadmissible to modify, vary, or contradict the language of the recorded documents. The court ruled the evidence was admissible to show context and intent.

Cameron Pelly, Amy Pelly, Bruce Kelleran, Rebecca Kelleran, Panasyuk, Tseng, engineer Jeffrey Layton, surveyor Bruce Dodds, landscape architect Thomas Walker, Hewitt Company representative Robert King, and shoreline permitting consultant Gregory Ashley testified at trial. The court admitted into evidence more than 80 exhibits, including the 1970 Grant of Easement and Quit Claim Deed; the 2005 Statutory Warranty Deed; and a number of photographs of the property, the Waterfront Strip, landscaping, and fences. The court issued a 25-page decision and extensive findings of fact.

The court rejected the argument that the Quit Claim Deed eliminated the easement rights to ingress and egress. Because the original parties executed the Grant of Easement and Quit Claim Deed as part of a single transaction to resolve the ownership dispute over the Waterfront Strip, the court concluded the two documents "must be read and interpreted in light of each other" and the parties "clearly intended them both to be effective." The court found that in exchange for easement rights, "the Kellerans quit-claimed to the Feys any fee interest they had in the same Waterfront Strip with one major reservation":

> [T]he Kellerans or their successor landowners retained the right to "prohibit the placing of any road or other structure of any kind" on the Waterfront Strip, again defined as extending to the adjacent shore lands of Lake Sammamish.

The court noted the reservation of rights in the Quit Claim Deed appeared broader in scope than the reservation in the Grant of Easement because "the word 'permanent' is not used to modify the word 'structure.' " Interpreting the language of the

11

two documents together, the court concluded Pelly had the right to prohibit only permanent structures.

> [G]iven the intent of the Kellerans and the Feys that the two documents be read together as a part of a single transaction, the Court concludes that the 1970 Quit Claim Deed reserved the right of the Pellys to restrict only permanent structures on the Waterfront Strip and its second class shore lands.

The court found the dock Panasyuk and Tseng sought to install was "a permanent structure within the meaning of the 1970 Easement or Quit Claim Deed."

> Although Hewitt did not originally design the Roll-A-Dock to be a permanent structure fixed to the lake floor, the type of dock the Defendants would need to install to ensure it remained in place would not be the lightweight portable version seen on the Roll-A-Dock website. The dock would need to be pinned to the lakebed with 6-inch augers and would need additional structural support to make it safe to use. . . .
> . . . Once erected, the dock will remain in the lake year round. . . .
> . . . The evidence leads the Court to conclude that this dock is a "permanent structure" within the meaning of the 1970 Easement and 1970 Quit Claim Deed.

The court concluded the 1970 Grant of Easement established the right to ingress and egress over the Waterfront Strip, including "the right to launch a trailered jet ski using a riding lawn mower," and that this right was not abandoned.

> The 1970 Grant of Easement established an easement for ingress and egress for foot traffic and boat access over the Waterfront Strip and the adjacent second class shore lands. This easement grants to the Pellys and their guests the right to walk across the Waterfront Strip to reach the Nelson and Hughes Properties. It also grants to the Pellys and their guests the right to use the easement area to launch boats into Lake

Sammamish. . . . The easement does not permit access by third parties unless accompanied by or authorized to use the easement by the Pellys.[2]

The court found certain landscaping and fencing interfered with the right to ingress and egress and required removal.[3] The court entered a final judgment and

---

[2] The findings of fact and conclusions of law state, in pertinent part:

Panasyuk and Tseng have not proven by a preponderance of the evidence that the Pellys or their predecessors intended to abandon all boat access rights. The Kellerans and Pellys have continued to use the easement to hand-carry watercraft to the lake. Panasyuk and Tseng have, by their own words and actions, indicated an intent to respect the Pellys' right to launch a hand-carried boat across the easement by installing a gate in the black metal fence for this purpose. Although the Pellys acquiesced in the installation of the black metal fence and landscaping, the Court finds that this lack of opposition to the fence and landscaping does not demonstrate an abandonment of all boat access easement rights because at the time Panasyuk and Tseng made these improvements, the Pellys could and did continue using the easement area to launch small watercraft.

. . . .

. . . The Kellerans apparently launched jet skis in this manner for many years before Panasyuk and Tseng purchased the property. . . . [T]he only reason they stopped was because Panasyuk and Tseng planted a hedge and placed potted plants along the western boundary, effectively precluding this type of boat access.

. . . .

. . . Panasyuk and Tseng have not established that the Pellys intentionally abandoned their right to use the Waterfront Strip to maneuver a jet ski and trailer in and out of their shed with a riding lawn mower.

[3] The findings of fact and conclusions of law state, in pertinent part:

The hedge has grown so much in the last 10 years that the hedge has become as impenetrable like a permanent fence . . . [.]

. . . The Court agrees with the Pellys that Panasyuk and Tseng intended this hedge to remain in place continuously and has become a permanent structure within the meaning of the 1970 Easement and Quit Claim Deed. However, the Pellys do not seek removal of the entire hedge. They only seek the removal of some of the plantings that they contend interfere with their easement rights. The Court finds that some of these planted Emerald Green shrubs do materially interfere with the Pellys' easement rights and should be removed . . . .

. . . In addition to the planted Emerald Greens, Panasyuk and Tseng placed additional potted Emerald Greens along the boundary near the lake. The plants have grown to such an extent that the roots have grown into the ground. These Emerald Green potted plants have, over time, become a permanent fixture on the strip. Some, but not all, of these potted plants are materially interfering with the Pellys' use and enjoyment of their easement rights.

injunction. The court ordered "Panasyuk and Tseng to do the following":



## Interpretation of the Grant of Easement and Quit Claim Deed

Panasyuk and Tseng appeal the summary judgment ruling that there were material issues of fact as to the intent of the Grant of Easement and Quit Claim Deed, denial of the motion to exclude extrinsic evidence, the findings of fact and conclusions of law, and the final judgment and injunction.

We review summary judgment do novo. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c).

The rules of contract interpretation apply to interpretation of an easement and a deed. Hollis v. Garwall, Inc., 137 Wn.2d 683, 695-96, 974 P.2d 836 (1999); Wilkinson v.

Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 249, 327 P.3d 614 (2014); Newport Yacht

Basin Ass'n of Condo. Owners v. Supreme Nw., Inc., 168 Wn. App. 56, 64-65, 277 P.3d

18 (2012). The interpretation of an easement and a deed is a mixed question of law

and fact.[4] "What the original parties intended is a question of fact and the legal

consequence of that intent is a question of law." Sunnyside Valley Irrig. Dist. v. Dickie,

149 Wn.2d 873, 880, 73 P.3d 369 (2003); Newport, 168 Wn. App. at 64. Because intent

is a question of fact, the court did not err in ruling on summary judgment that there were

material issues of fact. See Newport, 168 Wn. App. at 64.

Panasyuk and Tseng contend the court erred in admitting extrinsic evidence and

concluding the language of the Quit Claim Deed did not eliminate the easement right to

ingress and egress. Panasyuk and Tseng do not assign error to any of the extensive

findings of fact. Therefore, we treat the unchallenged findings as verities on appeal and

review only whether the unchallenged findings of fact support the conclusions of law.

Rush v. Blackburn, 190 Wn. App. 945, 956, 361 P.3d 217 (2015); Sunnyside, 149

Wn.2d at 879-80; Newport, 168 Wn. App. at 63. We review conclusions of law de novo.

Sunnyside, 149 Wn.2d at 880.

Washington courts follow the objective manifestation theory of contracts. Hearst,

154 Wn.2d at 503. "The touchstone of contract interpretation is the parties' intent."

Tanner Elec. Coop. v. Puget Sound Power & Light, 128 Wn.2d 656, 674, 911 P.2d 1301

(1996). "Under this approach, we attempt to determine the parties' intent by focusing on

---

[4] An easement appurtenant " 'is not a mere privilege to be enjoyed by the person to whom it is granted or by whom it is reserved. It passes by a deed of such person to his grantee and follows the land without any mention whatever.' " Heg v. Alldredge, 157 Wn.2d 154, 161, 137 P.3d 9 (2006) (internal quotation marks omitted) (quoting Winsten v. Prichard, 23 Wn. App. 428, 431, 597 P.2d 415 (1979)). Here, the Grant of Easement was recorded and expressly included in the Statutory Warranty Deed when Panasyuk and Tseng purchased the property in 2005.

the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." Hearst, 154 Wn.2d at 503. The court imputes "an intention corresponding to the reasonable meaning of the words used" and "generally give[s] words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." Hearst, 154 Wn.2d at 503-04. "Interpretations giving lawful effect to all the provisions in a contract are favored over those that render some of the language meaningless or ineffective." Grey v. Leach, 158 Wn. App. 837, 850, 244 P.3d 970 (2010).

In Berg v. Hudesman, 115 Wn.2d 657, 667, 801 P.2d 222 (1990), the Washington Supreme Court adopted the "context rule." The context rule recognizes that the "intent of the contracting parties cannot be interpreted without examining the context surrounding" the making of the contract. Hearst, 154 Wn.2d at 502 (citing Berg, 115 Wn.2d at 668). The court may consider extrinsic evidence of the surrounding circumstances to ascertain the intent of the parties in entering into an agreement. Hearst, 154 Wn.2d at 502.

Under the context rule, extrinsic evidence is admissible to ascertain the intent of the parties in entering into a contract and the meaning of the words used in the instrument. Hollis, 137 Wn.2d at 695; U.S. Life Credit Life Ins. Co. v. Williams, 129 Wn.2d 565, 569, 919 P.2d 594 (1996). The court may consider extrinsic evidence concerning (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7)

16

the course of dealing between the parties. Berg, 115 Wn.2d at 666-68. Such evidence is admissible regardless of whether the language in the document is ambiguous. Berg, 115 Wn.2d at 669; Hearst, 154 Wn.2d at 502. Extrinsic evidence is to be used only to "illuminate what was written, not what was intended to be written." Hollis, 137 Wn.2d at 697. Extrinsic evidence is not admissible to show "a party's unilateral or subjective intent as to the meaning of a contract word or term"; to show an intent "independent of the instrument"; or to "vary, contradict, or modify the written word." Hollis, 137 Wn.2d at 695.

Panasyuk and Tseng filed a motion in limine to exclude evidence related to the 1970 dispute, including court documents and correspondence. The court denied the motion to exclude the extrinsic evidence. The court ruled the evidence was admissible for purposes of considering the intent of the original parties. The court ruled:

> I do not intend to use any of those documents to modify or alter the terms of any agreement. They are purely being offered or accepted by this Court to demonstrate context and perhaps to show mutual intent of the parties. But I agree with you that I am not allowed to consider them just to look at the subjective intent of one party.

Panasyuk and Tseng rely heavily on Newport to argue the court erred by improperly considering extrinsic evidence to interpret the Grant of Easement and Quit Claim Deed. In Newport, Seattle Boat purchased commercial lakefront property to build a new storage and sales facility. Newport, 168 Wn. App. at 61. The Newport Yacht Basin Association of Condominium Owners (NYBA) opposed the project. Newport, 168 Wn. App. at 60-61. NYBA sued Seattle Boat to quiet title to three strips of the commercial property that the prior owners conveyed in 1981 by quitclaim deed. Newport, 168 Wn. App. at 63, 61-62. A real estate tax affidavit filed with the quitclaim

deed and signed by NYBA's then-vice-president described the deed as "a 'document in correction of easements.' " Newport, 168 Wn. App. at 62. The trial court relied on the real estate tax affidavit and NYBA board meeting minutes to conclude the deed did not convey fee title. Newport, 168 Wn. App. at 71. We held the trial court improperly relied on extrinsic evidence to contradict the unambiguous language of the quitclaim deed that conveyed title to the three strips of land. Newport, 168 Wn. App. at 71-72.

Here, unlike in Newport, the court did not consider extrinsic evidence to contradict or vary the unambiguous language of the recorded Grant of Easement and Quit Claim Deed. The record shows the trial court properly considered extrinsic evidence for context and to ascertain the intent of the original parties in entering into the Grant of Easement and Quit Claim Deed and to determine whether the two documents should be interpreted together as one single transaction.

> The Court finds persuasive the Pellys' evidence that the parties executed these two documents at the same time and meant for them to be a part of a single transaction. As the two property documents were executed at the same time and related to the same transaction, they must be read and interpreted in light of each other. The Court agrees with the ruling on summary judgment that "the documents inextricably relate in subject and chronology such that they are to be considered together." Order on Cross Motions for Summary Judgment at ¶3. See also, Kruger v. Horton, 106 Wn.2d 738, 742, 725 P.2d 417 (1986) ("it is [a] well[ ]settled principle that written instruments contemporaneously executed as part of the same transaction will be considered and construed as one transaction"). The Court rejects Defendants' contention that the 1970 Quit Claim Deed extinguished the 1970 Easement because the parties clearly intended them both to be effective.

A contract may consist of one or more documents. Kelley v. Tonda, 198 Wn. App. 303, 311, 393 P.3d 824 (2017). Documents that are part of the same transaction are interpreted together. Kelley, 198 Wn. App. at 311 (citing RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (AM. LAW INST. 1981)). " 'Instruments which are part of the same

transaction, relate to the same subject matter and are executed at the same time should be read and construed together as one contract.' " Cedar River Water & Sewer Dist. v. King County, 178 Wn.2d 763, 784-85, 315 P.3d 1065 (2013) (quoting Turner v. Wexler, 14 Wn. App. 143, 146, 538 P.2d 877 (1975)); see also Kruger, 106 Wn.2d at 742; Levinson v. Linderman, 51 Wn.2d 855, 859, 322 P.2d 863 (1958). This is so, even if the instruments do not explicitly refer to each other. Boyd v. Davis, 127 Wn.2d 256, 261, 897 P.2d 1239 (1995); Levinson, 51 Wn.2d at 859.

Whether two separate agreements are part of the same transaction depends on the intent of the parties as demonstrated by the agreements. Boyd, 127 Wn.2d at 261.

> "[T]he terms of agreement may be expressed in two or more separate documents, some of these containing promises and statements as to consideration, and others, such as deeds, . . . embodying performances agreed upon rather than a statement of terms to be performed. In every such case, these documents should be interpreted together, each one assisting in determining the meaning intended to be expressed by the others."

Kelley, 198 Wn. App. at 311-12[5] (quoting 5 MARGARET N. KNIFFEN, CORBIN ON CONTRACTS § 24.21, at 216 (rev. ed. 1998)).

The unchallenged findings establish the court did not err in concluding the Grant of Easement and the Quit Claim Deed should be interpreted together and given effect. In 1969, Fey and Kelleran disputed ownership to the Waterfront Strip. In 1970, they agreed to resolve the dispute by executing an easement and quitclaim deed. The Grant of Easement gave Kelleran the right to ingress and egress for foot traffic and boat access purposes over the Waterfront Strip and the right to prohibit placing any permanent structure on the Waterfront Strip. In exchange, Kelleran quitclaimed any interest in the Waterfront Strip subject to a reservation to prohibit any structure on the

---

[5] Alterations in original.

Waterfront Strip. The Grant of Easement was recorded on Tuesday, December 29, 1970. The Quit Claim Deed was recorded on Thursday, December 31, 1970. The parties then filed a stipulated order to dismiss the lawsuit.

The undisputed record establishes that after recording the Grant of Easement and Quit Claim Deed in 1970, Kelleran used the Waterfront Strip for ingress and egress for at least 35 years. The undisputed record also establishes that when Panasyuk and Tseng purchased the property in 2005, they had actual knowledge of the easement rights to ingress and egress and expressly recognized the rights to ingress and egress for foot traffic over the Waterfront Strip.

The court interpreted the language of the Grant of Easement and Quit Claim Deed together to determine the meaning of the restrictive covenant and whether the right to ingress and egress was eliminated. The language of the Quit Claim Deed prevents Panasyuk and Tseng from placing any "structure of any kind" on the Waterfront strip. But the Grant of Easement prohibits placing "any road or other permanent structure of any kind" on the Waterfront Strip.[6] Interpreting the language of the Grant of Easement and Quit Claim Deed as part of a single transaction and agreement, the court concluded Pelly had the right to prohibit only "permanent" structures on the Waterfront Strip, not to prohibit placing "any structure of any kind" on the Waterfront Strip. Absent the rights to ingress and egress, there would be no reason to prohibit permanent structures.

Panasyuk and Tseng argue the plain and unambiguous language of the Quit Claim Deed eliminates the right to ingress and egress. Panasyuk and Tseng also claim that because the Quit Claim Deed does not refer to ingress and egress, the Grant of

---

[6] Emphasis added.

Easement right to ingress and egress was terminated. These arguments ignore the finding that the Grant of Easement and Quit Claim Deed are part of the same transaction and should be interpreted together. Likewise, the argument that the language "hereafter acquire" as used in the Quit Claim Deed terminated the right to ingress and egress is unpersuasive. Interpreting the two documents together, "hereafter acquire" clearly applies only to interests conveyed after the parties executed and recorded the Grant of Easement and Quit Claim Deed.[7]

The court did not err in interpreting the Grant of Easement and Quit Claim Deed together, concluding the rights to ingress and egress is not eliminated, and giving effect to the two documents. We affirm the order on summary judgment, the findings of fact and conclusions of law, and entry of the final judgment and injunction.

WE CONCUR:

---

[7] We also reject the argument that interpreting the Grant of Easement and Quit Claim Deed together undermines the recording system. The undisputed record establishes the Statutory Warranty Deed expressly sets forth the easement right to ingress and egress and the right to prohibit placing structures on the Waterfront Strip.

21