FILED
COURT OF APPEALS
DIVISION II

2014 SEP -9 PM 9: 21

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| HARTFORD FIRE INSURANCE COMPANY, <br><br> Appellant, <br><br> v. <br><br> COLUMBIA STATE BANK, <br><br> Respondent. | No. 45320-7-II <br><br><br><br> PUBLISHED OPINION |

MELNICK, J. — Hartford Fire Insurance Company (Hartford) appeals from the superior court's grant of summary judgment dismissal of Hartford's claims against Columbia State Bank (Columbia) and the superior court's denial of Hartford's summary judgment motion. Hartford had issued bonds for Waka Group Inc. (Waka), a general contractor, and made payments under one bond when Waka defaulted on a project. Hartford argues that it was entitled to recover progress payment funds Columbia removed from Waka's collateral control account because Waka had a contractual obligation to hold progress payments in trust for Hartford's benefit to provide reimbursement for bond payments, and that Columbia knew or should have known the funds were held in trust. In the alternative, Hartford argues that it had an equitable lien on the progress payment funds that was superior to Columbia's right to the funds.

We hold that the contract between Hartford and Waka did not create an express trust and that Hartford did not possess an equitable lien on the progress payment funds. As a result, we hold that Hartford is not entitled to recover the funds from Columbia. We affirm the superior court's summary judgment dismissal of Hartford's claims.

FACTS

Hartford issued performance and payment bonds as surety for Waka's construction contracts. On June 13, 2011, as partial consideration for this arrangement, Hartford and Waka executed a General Indemnity Agreement (Indemnity Agreement). The Indemnity Agreement included a "Trust Fund" provision, which stated:

> If a Bond is Underwritten in connection with the performance of any contract, the entire contract price shall be dedicated to the satisfaction of the obligations of the Bond and this Agreement. All money paid or any securities, warrants, checks or evidences of debt given under contracts relating to or for which a Bond has been issued *shall be impressed with a trust for the purpose of satisfying the obligations of the Bond Underwritten for said contract* and this Agreement and shall be used for no other purpose until all such obligations have been fully satisfied.

Clerk's Papers (CP) at 13 (emphasis added).

Waka needed to obtain working capital to complete its projects. On June 14, 2011, Waka executed and delivered a commercial line of credit agreement and note (Note) along with a business loan agreement to Columbia. An addendum to the business loan agreement titled "Control Account," stated that Waka

> shall deposit all cash, instruments and other proceeds received from the operation of [Waka's] business into an account established with [Columbia] within two (2) business days after receipt of such amounts (the "Control Account"). . . . [Columbia] is authorized to pay down the unpaid Loan balance, on a daily basis, from funds in the Control Account.

CP at 245. At the same time, Waka executed and delivered a commercial security agreement to Columbia to provide collateral for the Note. The security agreement provided Columbia with a Uniform Commercial Code (UCC) article 9 security interest in Waka's inventory, equipment, chattel paper, accounts, general intangibles, and the products and proceeds thereof, whether then owned or later acquired. On June 20, Columbia timely perfected its security interest in the collateral by filing a UCC financing statement.

In early 2012, Waka contracted with the General Services Administration (GSA) for a project on the Dalton Cache Border Station in Haines, Alaska (Dalton Project). On March 1, pursuant to the Indemnity Agreement, Hartford issued a performance bond and a payment bond for the Dalton Project.

For its projects, including the Dalton Project, Waka had automatic deposit payments made into its collateral control account with Columbia. Waka then used that money to pay its subcontractors and suppliers. The Note matured on May 30, 2012, and Waka failed to repay the loan evidenced by the Note. On or about June 18, Columbia met with Waka's president and told him it was going to call Waka's loan.

At approximately the same time, after learning that Waka would be unable to complete the project, Hartford began taking steps to take over and complete the Dalton Project pursuant to its obligations under the bonds. On June 20, Hartford notified the GSA that it would be completing the Dalton Project and requested that the GSA direct all future progress payments to Hartford. Also in mid-June, Waka notified the GSA that it would not be able to complete the Dalton Project.

On June 21, Waka sent the GSA a letter directing it to send all future payments for the Dalton Project to Hartford. The GSA agreed, but despite its attempts, it could not stop a progress payment in the amount of $103,410 from being deposited into Waka's collateral control account with Columbia. On that same day, Hartford sent Columbia a letter notifying Columbia of the trust fund language in its Indemnity Agreement with Waka. It instructed Columbia to hold the Waka funds in trust for the benefit of Hartford and other trust beneficiaries. However, Columbia had already applied the $103,410 GSA progress payment to Waka's outstanding loan balance.[1]

---

[1] This event occurred on June 21 but the bank statement reflects the transfer occurring on June 22.

On June 25, the GSA sent Hartford an official demand letter to complete the Dalton Project pursuant to its obligations under the performance bond. On July 13, Hartford and the GSA executed a takeover agreement for Hartford to complete the Dalton Project, and four days later Hartford made its first payment to subcontractors under its bond obligations.

On August 10, Hartford sent Columbia a letter requesting that the $103,410 progress payment be released to Hartford. Columbia responded it had no obligation to return the funds and declined the request. In January 2013, Hartford filed a lawsuit against Columbia for misappropriation of trust funds, wrongful setoff, conversion, and declaratory relief.

Hartford moved for summary judgment and argued that the money deposited on June 21 went into a trust fund for its benefit and that Columbia had sufficient notice of this fact. Hartford also argued that it had an equitable lien on the funds. Columbia also moved for summary judgment and argued that the progress payment was not a trust fund deposit and that Columbia had no way of knowing of Hartford's claim to the money when GSA deposited it. The superior court granted Columbia's motion for summary judgment and dismissed Hartford's complaint with prejudice. Hartford appeals the superior court's grant of summary judgment in favor of Columbia and the superior court's denial of its motion for summary judgment.

ANALYSIS

I. STANDARD OF REVIEW

We review an order for summary judgment de novo, engaging in the same inquiry as the trial court. *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 271, 285 P.3d 854 (2012). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). We construe

all facts and their reasonable inferences in the light most favorable to the nonmoving party. *Loeffelholz*, 175 Wn.2d at 271. Summary judgment is proper only if reasonable persons could reach but one conclusion from the evidence presented. *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 708, 153 P.3d 846 (2007).

II.    EXPRESS TRUST

Relying on *Westview Investments, Ltd. v. U.S. Bank National Association*, 133 Wn. App. 835, 138 P.3d 638 (2006), Hartford argues that Waka was contractually obligated to hold the Dalton Project progress payments in trust for the benefit of Waka's subcontractors and Hartford and that Columbia either knew or should have known this fact. As a result, Hartford maintains that the funds did not belong to Waka and Columbia had no right to take them to repay Waka's debt. We disagree and hold that the contract language did not create an express trust. Because no express trust existed here, *Westview* does not apply and Hartford's argument fails.

Express trusts are "'[t]hose trusts which are created by contract of the parties and intentionally.'" *In re Wash. Builders Ben. Trust*, 173 Wn. App. 34, 58, 293 P.3d 1206 (quoting *Farrell v. Mentzer*, 102 Wash. 629, 632, 174 P. 482 (1918), *review denied*, 177 Wn.2d 1018 (2013). "'An express trust is one created by the act of the parties; and, where a person has, or accepts, possession of money, promissory notes, or other personal property with the express or implied understanding that he is not to hold it as his own absolute property, but to hold and apply it for certain specified purposes, an express trust exists.'" *Westview*, 133 Wn. App. at 845-46 (quoting *State v. Southard*, 49 Wn. App. 59, 63 n.3, 741 P.2d 78 (1987)).

In *Westview*, Division One of this court held that two provisions in a contract between a project owner and a general contractor created an express trust. 133 Wn. App. at 846. In that case, a contractor secured a line of credit with U.S. Bank. *Westview*, 133 Wn. App. at 840. The

contractor then entered into separate agreements with Westview Investments and Tukwila Self Storage (owners) to perform construction work on their specified properties. *Westview*, 133 Wn. App. at 841, 844. The owners wired progress payments to the contractor's cash collateral account at U.S. Bank. *Westview*, 133 Wn. App. at 842-44. The owners made the payments for the labor and materials the contractor provided on the project. *Westview*, 133 Wn. App. at 842-44. U.S. Bank applied the money to the contractors' lines of credit. *Westview*, 133 Wn. App. at 843-44. The contractor went out of business before completing the construction work for the owners. *Westview*, 133 Wn. App. at 843. When the contractor went out of business, it did not pay the subcontractors in full. *Westview*, 133 Wn. App. at 843. The owners paid the subcontractors and then filed suit claiming that the progress payments were funds held in trust for the benefit of the subcontractors. *Westview*, 133 Wn. App. at 843.

The contracts between the contractor and the owners stated, "The Contractor shall promptly pay each Subcontractor, upon receipt of payment from the Owner, out of the amount paid to the Contractor on account of such Subcontractor's portion of the Work, the amount to which said Subcontractor is entitled," and "payments received by the Contractor for Work properly performed by Subcontractors and suppliers *shall be held by the Contractor* for those Subcontractors or suppliers who performed Work or furnished materials, or both, under contract with the Contractor for which payment was made by the Owner." *Westview*, 133 Wn. App. at 846 (emphasis added). The *Westview* court held that the "contract language evinces an express understanding on the part of the general contractor that it is not to hold the progress payments as its own absolute property but to hold and apply them for certain specified purposes, that is, for the benefit of the subcontractors." 133 Wn. App. at 847.

6

The primary objective in contract interpretation is to ascertain the mutual intent of the parties at the time they executed the contract. *Int'l Marine Underwriters v. ABCD Marine, LLC*, 179 Wn.2d 274, 282, 313 P.3d 395 (2013). Washington follows the "objective manifestation theory" of contract interpretation, under which the focus on the reasonable meaning of the contract language to determine the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times, Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005).

Here, Hartford argues that a provision in its Indemnity Agreement with Waka titled "Trust Fund," creates an express trust.[2] The provision states:

> If a Bond is Underwritten in connection with the performance of any contract, the entire contract price shall be dedicated to the satisfaction of the obligations of the Bond and this Agreement. All money paid or any securities, warrants, checks or evidences of debt given under contracts relating to or for which a Bond has been issued *shall be impressed with a trust for the purpose of satisfying the obligations of the Bond Underwritten for said contract* and this Agreement and shall be used for no other purpose until all such obligations have been fully satisfied.

CP at 13 (emphasis added).

*Westview* is distinguishable from this case. In *Westview*, the property owner and the contractor agreed to the establishment of the trust for the benefit of the subcontractors. 133 Wn. App. at 841, 844, 846. Here, the surety sits in a different position than the property owner. The GSA is akin to the owners in *Westview*. In *Westview*, the subcontractors were not paid in full. 133 Wn. App. at 843. Here, there is no evidence the subcontractors were not paid at the time of the $103,410 deposit.

---

[2] Hartford also argues a provision in the contract between the GSA and Waka creates an express trust. But that provision merely states that the GSA will make progress payments, what the contractor must include in its requests for progress payments, and that the contractor must certify that the progress payment requests are proper. The provision does not require Waka to hold any funds for the benefit of the subcontractors or demonstrate any intent by the parties to create an express trust.

Further, the contract provisions in *Westview* expressly stated that the general contractor had to hold the payments for the benefit of project subcontractors. 133 Wn. App. at 846. Here, there is no such requirement. Even though the provision in the Indemnity Agreement is titled "Trust Fund" and stated that project payments would be "impressed with a trust" to satisfy bond obligations, the language does not demonstrate an express understanding that Waka would *hold* progress payments in trust. CP at 13. Additionally, there is no evidence that Hartford or Waka contemplated that project payments would be held to satisfy bond obligations. Instead, until mid-June 2012, Waka was free to spend the funds without any oversight of Hartford and for work performed on multiple projects.

Hartford's argument that all project payments were immediately impressed with a trust to satisfy some future, contingent bond liability would lead to absurd results. We avoid interpreting statutes and contracts in ways that lead to absurd results. *Forest Mktg. Enters., Inc. v. Dep't of Natural Res.*, 125 Wn. App. 126, 132, 104 P.3d 40 (2005). Under this argument, Waka could not use project payments to pay subcontractors or pay for other project expenses until completion of the project and discharge of the bond. Obviously, this result is not what the parties intended. Instead, it appears that the contract language provides for the creation of an express trust at some point in the future, after Hartford actually made payments under the bond.

Here, the contract language did not establish an immediate trust. And the trust provision was not triggered until Hartford started making payments under the bond in July. Thus, at the time the GSA deposited the $103,410 progress payment into Waka's account and Columbia took the money to satisfy its debt, no express trust existed.

We hold that the Indemnity Agreement did not establish a trust and that no trust existed. Accordingly, Columbia had no duty to inquire if the funds were being deposited into a trust account.

III.     EQUITABLE SUBROGATION

Hartford next argues that it possessed an equitable lien on the progress payment funds under the principles of equitable subrogation and that its lien was superior to Columbia's. Because Hartford had not suffered a loss at the time the progress payment at issue was deposited, it did not possess an equitable lien.

Equitable subrogation allows a party who satisfies another's obligation to recover from the party primarily liable for the extinguished obligation. *Columbia Cmty. Bank v. Newman Park, LLC*, 177 Wn.2d 566, 573, 304 P.3d 472 (2013). "The right of 'legal' or 'equitable' subrogation arose as a 'creature of equity' and 'is enforced solely for the purpose of accomplishing the ends of substantial justice.'" *In re Hamada*, 291 F.3d 645, 649 (9th Cir. 2002) (quoting *Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 302, 7 S. Ct. 482, 30 L. Ed. 595 (1887)).

Sureties who are forced to pay their principal's debts are entitled to be reimbursed. *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-38, 83 S. Ct. 232, 9 L. Ed. 2d 190 (1962). This right of subrogation occurs even without a contractual promise. *Pearlman*, 371 U.S. at 136-37. Sureties have an equitable right to be indemnified from the retained funds. *Pearlman*, 371 U.S. at 136-38 ("Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement. . . . And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed."). "[W]here a surety performs under a performance bond after the default of the contractor, it is entitled to an equitable lien on funds previously withheld by reason of the

contractor's default, at least to the extent of the surety's expenses." *Levinson v. Linderman*, 51 Wn.2d 855, 863, 322 P.2d 863 (1958) (citations and internal quotation marks omitted).

However, Hartford had not obtained an equitable lien at the time Columbia took the money from Waka's account for two reasons. First, the equitable right of subrogation is created at the time the surety issues the payment and/or performance bonds. *Levinson*, 51 Wn.2d at 864; *see also In re Massart Co.*, 105 B.R. 610, 612 (W.D. Wash. 1989). But the right of *enforcement* under equitable subrogation becomes available only after the "surety suffers a loss by making payments pursuant to the obligation under the bond." *Massart*, 105 B.R. at 612 (internal quotation marks omitted); *see also Levinson*, 51 Wn.2d at 864 (right of equitable subrogation became available when the surety completes the work at a loss).

Here, Hartford argues that it has a superior right to the $103,410 progress payment because it had an equitable lien in the Dalton Project progress payments beginning on June 21, 2012 when it issued its bonds for the Dalton Project. But Hartford had not yet acted under its performance bond at the time of the $103,410 deposit and there is no evidence that the Dalton Project subcontractors or suppliers had not been paid. Thus, there is no evidence that Hartford had suffered or performed work at a loss at the time of the progress payment. The right to be indemnified does not arise until money has actually been expended. *See Massart*, 105 B.R. at 612.

Second, "[o]rdinarily a surety asserts the doctrine of equitable subrogation to acquire retained contract funds that are still in the government's possession after performance of the contract is complete." *Capitol Indem. Corp. v. United States*, 71 Fed. Cl. 98, 102 (2006) (citing *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227, 17 S. Ct. 142, 41 L. Ed. 412 (1896)). However, no retained or unpaid funds existed in this case. Instead, a direct deposit of a progress payment went into Waka's account with Columbia. Progress payments differ from

retained funds because progress payments are funds that belong to the free flow of commerce once they are properly paid over. *Capitol Indem. Corp. v. United States*, 41 F.3d 320, 325 (7th Cir. 1994) ("Funds intended from the inception of a contract to settle potential claims differ vastly from progress payments, which belong to the free flow of commerce from the time they are properly paid over.").

Accordingly, we hold that Hartford did not possess an equitable lien in the progress payment that is superior to Columbia's right to the progress payment.[3] We affirm the superior court's granting of summary judgment to Columbia and its order dismissing Hartford's claims.

Melnick, J.

We concur:

Johanson, C.J.

Maxa, J.

---

[3] Because Hartford's express trust and equitable subrogation arguments fail, it has no right to claim any entitlement to the funds. Accordingly, we need not address Hartford's conversion argument.