# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY, a Florida corporation, | No. 83925-0-I (Consolidated with No. 84385-1-I) |
| Plaintiff, | |
| v. | DIVISION ONE |
| ARCON TENANT IMPROVEMENT CONTRACTORS, LLC, a Washington limited liability company, | UNPUBLISHED OPINION |
| Petitioner, | |
| BRMK LENDING, LLC, a Delaware limited liability company as successor in interest by merger of PBRLF I, LLC, a Washington limited liability company; and SARA AL MUGHAIRY, a married woman as her separate property; LAWRENCE SHIN, a single person; WESLEY JOURDAN CANETE, a single person; RENE N. FULLER and RONGPING HUANG, spouse and spouse; COOLIE CALIHAN, a single person; XIAOLONG ZHU, a single person; YANG LU, a single person; TYLER SCOTT RICE, a single person; BEN GROVES, a single person; VERONICA LATOYA BYNUM, a single person; TRUC TON and MAI NGO, spouse and spouse; DANIEL CLARK EPPERSON, a single person; TRUCMAI TON, a single person; CANDY XIAO, a single person; WILLIAM K. LUU, a single person; DUSTIN JOHN STEINBECK and MAXINE MICHELLE STEINBECK, | |

spouse and spouse; MUSA KEWA, a single person; VENKATA VYSYARAJU, a single person; DANIEL LU ZHU, a single person; YOON PYO HONG, a single person; SUMIT MANCHANDA and MEGHA BAWA, spouse and spouse; CAROL LO, a single person; WENBO LI, a married person as separate property; SOLOMON R. WALDBAUM, a single person; NANCY SIJIA CHENG, a single person; ORLANDO O'NEILL, a single person; HONGKE QIN, a single person; TOMMY M. CHUE and ANNIE PENG, spouse and spouse; BRETT HARRIS, a single person; KOUSHIK S. KRISHNAN, a single person; JOO SUNG NAM and HEE YOUNG CHUNG, spouse and spouse; SERGEI VOROBEV and SVETLANA GAIVORONSKI, spouse and spouse; TUSHAR AGRAWAL and RENUKA AGRAWAL, spouse and spouse; NICOLAS DE CRISTOFARO, a single person; DARRYL AINBINDER and LILY LEE-CHUAN MAI, spouse and spouse; DALIN AINBINDER, a single person; DANIEL J. AGUIRRE, a single person; DANIEL STORY, a single person; PHONG V. VUONG, a single person; KIMBERLY JOANNE KUNG, a single person; GENNEVI F. LU, a single person; DMITRY POLEVOY, a single person; NIKOLAOS PAVLAKIS and NIKOLETA KASAPAKI, spouse and spouse; ALLISON C. O'BRIEN, a single person; and UNNAMED JOHN AND JANE DOE, Edison Capitol Hill Condominium Owners,

Respondents,

12TH AND JOHN INVESTORS, LLC, a Washington limited liability company,

Defendant,

BRMK LENDING, LLC, a Delaware
limited liability company as successor in
interest by merger of PBRLF I, LLC, a
Washington limited liability company,

        Third-Party Plaintiff,

MTC FINANCIAL, INC., d/b/a
TRUSTEE CORPS, a Washington
corporation,

        Third-Party Defendant.

      COBURN, J. — This discretionary review involves multiple summary judgment orders centered around the interpretation of complex agreements entered into by the insolvent owner/developer of the Edison Condominium project, its lender, and the project's general contractor. The agreements included a grant of a deed of trust on the developed property to the contractor, Arcon Tenant Improvement Contractors, LLC (Arcon), to secure payment of money owed Arcon in accordance with the agreements. Payment disputes led to Arcon refusing to grant partial releases of its deed of trust and issuing notices of default and foreclosure on sold condominium units, which led to multiple claims by multiple parties. Fidelity National Title Company sued Arcon and the lender, BRMK Lending, LLC (BRMK), for breach of contract. BRMK then filed a cross-claim against Arcon for breach of contract, declaratory injunctive relief, and specific performance. A group of condominium owners (Owners) sued Arcon seeking declaratory and injunctive relief and to quiet title. The superior court entered a preliminary injunction prohibiting Arcon from foreclosing on any condominium units. Following partial summary judgment motions, the court concluded that the Owners were third-party beneficiaries, found that Arcon breached its covenant to grant partial

3

releases of its deed of trust, permanently enjoined Arcon from its foreclosure sales, and granted the Owners' motion to quiet title. The court also denied Arcon's motion requesting a determination that BRMK breached a modification of the original agreement.

We hold that the plain language of the agreements does not support permitting BRMK to increase the loan amount used in the agreed payment formula by adding later advanced funds. We also reverse the superior court's ruling that Arcon had an "unequivocal obligation" to grant partial releases of its deed of trust. Arcon maintains that it was no longer obligated to release deeds of trust because BRMK first materially breached the payment agreement. Because genuine issues of fact remain as to whether Arcon breached its covenant to grant partial releases of its deed of trust, we reverse the summary judgment order finding otherwise. Though we agree that the Owners are third-party beneficiaries based on the record before us, we also reverse the trial court's order quieting title and permanently enjoining Arcon from exercising its right to foreclose units under its deed of trust. Lastly, we affirm the lower court's denial of Arcon's partial summary judgment motion requesting a determination that BRMK breached a modification of its original agreement with Arcon, but we do so for reasons different from the superior court's reasoning as explained below.

We affirm in part, reverse in part, and remand.

FACTS

Capitol Hill Subway, LLC (Capitol) is the owner and developer of the 51-unit Edison Condominiums. To develop the project, Capitol obtained a $17,615,000

4

construction loan in July 2018 from BRMK's predecessor in interest.[1] The Construction Loan Agreement provides that the lender may, upon the occurrence of an uncured default by Capitol, "take possession of the Project and perform any and all work and labor necessary to complete the Project." In such event "[a]ny funds disbursed by Lender in excess of the maximum principal amount of the Loan will be considered an additional loan to Borrower." The Construction Loan Agreement granted the lender power of attorney upon the occurrence of a default which is not timely cured in accordance with the loan documents.[2]

Capitol hired Arcon as the general contractor. At some point near the completion of the project but before any condominium units were sold, Capitol became insolvent. Arcon and the unpaid subcontractors on the project contemplated recording mechanic's liens against the property. However, after negotiations in February 2019, Arcon, BRMK, and Capitol executed multiple inter-reliant contracts to avoid the recording of any mechanic's liens so that the condominium units could be sold and the debts to BRMK, Arcon, and Arcon's subcontractors could be paid using the proceeds. At the time, the parties anticipated that the sale proceeds of the condominium units would likely be sufficient to fully pay both Arcon and BRMK.

The negotiations produced multiple contracts: 1) a Promissory Note from Capitol to Arcon for $1,231,665 for its construction work; 2) the Arcon Deed of Trust (ADOT) from Capitol to secure payment on the construction work; 3) a Lien Waiver Agreement

---

[1] BRMK's predecessor in interest, PBRELF I, LLC, and BRMK are collectively referred to as BRMK.

[2] The lender, BMRK, could "pay, settle or compromise all existing bills and claims which may be liens against the Project or as may be necessary or desirable for the completion of the Project or for clearance of title; and . . . do any and all things which Borrower might do on its own behalf in order to complete the Project free and clear of all liens and encumbrances."

(LWA) entered into by BRMK, Capitol, and Arcon on March 5, 2019, that outlined the formula by which the proceeds from the sale of the condominium units would be distributed; and 4) an indemnity agreement between Arcon (indemnitor) and Fidelity National Title. The LWA and ADOT were drafted by BRMK's law firm.

The Promissory Note established that

This Note shall be paid as funds become available from proceeds from the sale of condominium units to be developed on the real property encumbered by the Deed of Trust defined below pursuant to the terms of an Agreement Regarding Lien Waivers (the "Agreement") among Maker, Holder and PBRELF I, LLC ("First Lender").

The Note was secured by the ADOT, which was junior to the first Deed of Trust belonging to BRMK that secured the $17,615,000 construction loan.

The ADOT secured obligations that included "Performance by Grantor of each agreement of Grantor herein contained or contained in the Agreement or Note." In the ADOT, the grantor represented, warranted and agreed that it "will pay the amount owed for the Construction Work pursuant to the Note and [LWA], and will perform and comply with each and every term, covenant and condition hereof, and of the [LWA]." The ADOT listed failing to "pay amounts owed under the Note or to pay or perform in accordance with the [LWA]" as an act or occurrence that shall constitute a default.

The Lien Waiver Agreement

The LWA lists multiple recitals:

A. Borrower is indebted to Lender in the original principal amount of Seventeen Million Six Hundred Fifteen Thousand and 00/100 Dollars ($17,615,000.00) (the "Loan").

B. The Loan is evidenced by a Promissory Note in the amount of the Loan, executed by Borrower in favor of Lender (the "Note").

C. The repayment of the Loan is secured by a Deed of Trust, Security Agreement and Fixture Filing with Assignment of Leases and Rents (the "Lender Deed of Trust"), from Borrower, as grantor therein, in favor of Lender, as beneficiary therein. . . . .

D. Arcon asserts that it is owed $1,492,930.59, as of February 1, 2019, from Borrower for construction services (the "Construction Work") related to the development of the Property into a condominium known as the Edison Condominium (the "Condominium"). The amount claimed to be owed for the Construction Work is set forth on Exhibit B attached hereto with the amount owed each subcontractor of Arcon clearly identified on Exhibit B. Each unit of the Condominium is hereinafter called a "Unit" and collectively called the "Units".

E. Arcon represents that neither it nor any subcontractor that it is aware of is owed any amount other than set forth on Exhibit B.

F. As part of the above amount, Arcon advanced Borrower Two Hundred Sixty One Thousand Two Hundred Sixty Five and 05/100 Dollars ($261,265.05).

G. Arcon has agreed not to file/record a mechanics' lien for the Construction Work, subject to the terms and conditions of this Agreement.

The parties agreed in the LWA that in consideration of a cash payment of $261,265.05 made in March 2019, "Arcon agrees not to file or record a mechanics' or other lien on the Property for the Construction Work or any other amounts." Further, the "Cash Payment shall be added to the unpaid balance owed by Borrower to Lender under the Loan." The LWA acknowledges the ADOT is a security of the balanced owed:

Deed of Trust for Balance Owed. After payment of the Cash Payment, the remaining unpaid balance of the Construction Work shall be secured by a deed of trust (the "Arcon Deed of Trust"), in the form attached hereto as Exhibit F, to be executed by Borrower in favor of Arcon and shall accrue interest on a monthly basis as provided in the attached Exhibit C note (the "Arcon Note"). . . . Arcon shall issue a partial release from the Arcon Deed of Trust upon the sale of each Unit.

Section 5 of the LWA outlines the methodology of the payment of the balanced owed.

The Lender (BRMK) shall receive 100 percent of the net sales proceeds from the sale of

the first 10 units.  Then,

> [f]rom the sale of each Unit, Lender shall receive cash in an amount
> determined in accordance with the following formula: (X) the amount of
> principal and interest, including fees (such fees not to exceed one-half of
> one percent (0.5%) per month and such interest not to exceed 1% per
> month), then outstanding under the Loan divided by (Y) the number of
> unsold Units, including the Unit then being sold, plus (Z) the amount of
> any liens against the Property paid by Lender to subcontractors shown on
> Exhibit B (or valid claims through Arcon not shown on Exhibit B) and that
> were recorded against the Property after February 26, 2019, which
> amounts, to the extent not already paid under the second sentence of
> this section 5, shall also be deducted from the amount of the Construction
> Work and the Arcon Note. For clarity purposes it is $(X \div Y) + Z$.

Any proceeds in excess of this formula would be split 50/50 between BRMK and Arcon.

Thus, the bigger the X, amount of principal and interest, the more proceeds the lender

received upfront before splitting the excess between the lender and Arcon.  Arcon's 50

percent interest in the excess sale proceeds were to be "held by Lender in a separate

account . . . and paid out on a monthly basis."  Arcon and its subcontractors were to be

paid from this account in accordance with another formula in the LWA.  About a week

before the LWA was executed, the parties believed that it would take the sale of about

20 units to pay Arcon in full in about two months.  Under the indemnity agreement with

Fidelity National Title, Arcon was to

> hold harmless, protect and indemnify Title Company from and against any
> and all liabilities, losses, damages, expenses and charges including
> attorneys' fees and expenses of litigation, which Title Company may
> sustain under any policy of insurance respecting the land resulting directly
> or indirectly from any mechanic's lien, or claim thereof, or which Title
> Company may sustain in the enforcement of this Agreement.

Performance Under the Lien Waiver Agreement

After the first six units sold in March 2019, the Fidelity escrow officer in charge of closing services asked Arcon to grant partial releases for those units. Arcon complied and Fidelity recorded those reconveyances. The next request for releases came later in spring 2019 for five units. Arcon did not grant the releases.

Arcon took issue with BRMK's characterization of which unit was the tenth unit sold, of which Arcon would receive no proceeds, and which was the eleventh unit sold, which would trigger the application of the proceeds formula from the LWA. The units were sold about two hours apart. Those two units were not of equal monetary value. Arcon maintains that this "switch" in the accounting resulted in an "under-calculation of the amount due Arcon and its sub[contractor]s under the terms of the Lien Waiver Agreement by over $80,000." Arcon notified BRMK by at least April 22 of their belief that Arcon was owed additional funds because of this accounting decision.

On April 30, BRMK allegedly added $118,943.61 to the loan balance due them from Capitol and added this figure to the "outstanding principal owed" in the payment formula under the LWA. The record indicates that, according to BRMK's own accounting, BRMK has advanced no less than an additional $2.476 million dollars "to complete the project and maintain the property, making sales of units possible" and added that amount to the loan figure used in the payment formula. The parties continued to dispute the amount owed to Arcon and whether the LWA allows BRMK to increase the "loan" amount used in the formula.

Despite these ongoing disagreements, Capitol continued to sell condominium units with Fidelity providing title insurance and handling the closings. The title insurance

policies obligated Fidelity to clear certain liens on the Edison Condominium units not excepted in the policies. Believing Arcon had to grant partial releases of its deed of trust upon a sale of a condominium unit under the LWA, Fidelity "removed, and did not except, the Arcon Deed of Trust lien from the final owners' title policies issued to 43 owners of the Edison Condominium units."

Arcon issued a Notice of Default to BRMK on September 11, 2020, detailing various alleged breaches of the LWA and confirming "that Arcon [would] not release its Deed of Trust from any units until" the defaults were cured.

In October, with sales of the remaining condominium units nearing completion, BRMK and Arcon appeared to come to an agreement via emails and a draft escrow agreement that the proceeds from the sale of Unit 201 would be held in escrow by Fidelity, the title company, and only paid out with the mutual consent of Arcon and BRMK upon receipt by Fidelity of a court order or arbitration award. Internal emails between BRMK and their counsel discussed and approved of a course of action to reach out to Arcon's manager to "negotiate to have #201 close with escrow holding 100% of net proceeds until we resolve the contract dispute." The draft escrow agreement includes a "Reservation of Rights" section that expressly contemplates Arcon and BRMK continuing to seek enforcement of their rights and remedies under the LWA "[e]xcept as expressly provided herein."

Unit 201 sold, but the proceeds were not held in escrow and instead wired directly to BRMK by Fidelity, to BRMK's own apparent surprise. BRMK does not dispute that it had agreed to set aside the proceeds of Unit 201 and concedes it has no explanation as to what happened. In follow-up negotiations in February 2021, BRMK

offered to set aside proceeds from both Unit 201 and Unit 206 in exchange for Arcon agreeing to release its deed of trusts as to all units. These negotiations were unsuccessful.

## Procedural History

Arcon issued a Notice of Default on its Deed of Trust in April 2021, and recorded a Notice of Trustee's Sale in June.

In July, Fidelity filed a complaint for breach of contract against Arcon and BRMK as co-defendants. In addition to a monetary judgment, it sought an order enjoining Arcon from foreclosing the ADOT against any Edison Condominium unit and to set aside the notice of foreclosure. Fidelity's principal allegation was that Arcon's decision to stop releasing partial deeds of trust resulted in Fidelity issuing titles without clearing the ADOT or excepting it in the title insurance policies. Fidelity also claimed that Arcon is obligated to indemnify Fidelity.

In its answer, BRMK filed a cross-claim against Arcon for breach of the LWA, declaratory injunctive relief, and specific performance. The next day, 39 individual Edison Condominium unit owners (Owners) sued Arcon seeking declaratory and injunctive relief to release the ADOT, to enjoin the foreclosure sale, and to quiet title. The parties agreed to consolidate the two matters. The trial court entered a preliminary injunction in September prohibiting Arcon from foreclosing on the condominium units.

After further proceedings, disputed legal issues were presented to the trial court in multiple motions for partial summary judgment. In January 2022, Arcon filed a motion for partial summary judgment claiming BRMK breached the "Modification to the Lien Waiver Agreement" by not placing sale proceeds from Unit 201 into an escrow account

11

"in exchange for Arcon's agreement to release its Deed of Trust on Unit 201 when the funds were deposited." The same day, BRMK filed its motion for partial summary judgment requesting the court find that Arcon breached its covenant to release its deed of trust on past sold units and that LWA's reference to "then outstanding under the Loan" in paragraph 5(a) means the amount outstanding on the loan from BRMK to Capitol as provided for in the loan documents. The court denied Arcon's motion and granted BRMK's motion.

Arcon filed a second motion for partial summary judgment requesting the court dismiss the Owners' complaint with prejudice because they are not third-party beneficiaries. The court denied that motion.

The Owners also filed a motion for summary judgment on their complaint. The court granted their motion.

In April 2022, Arcon sought discretionary review with this court of all four summary judgment orders. It also successfully petitioned the King County Superior Court for appointment of a general receiver to manage the property pursuant to RCW 7.60.025. A commissioner of this court granted discretionary review of all four orders without limitation.[3]

---

[3] The commissioner also later granted Arcon's requested discretionary review of the trial court's July 28, 2022 order to disburse funds held by Capitol's Receiver to BRMK. Finding that the trial court's July 28 order was inextricably intertwined with the summary judgment orders at issue, the commissioner consolidated both matters for this court's review. Arcon fails to assign error to the trial court's decision to disburse funds or otherwise address that issue in its opening brief. We consider this issue waived. State v. Sims, 171 Wn.2d 436, 441, 256 P.3d 285 (2011) (A party "is deemed to have waived any issues that are not raised as assignments of error and argued by brief."); RAP 10.3(a)(4), (g). While Arcon was seeking discretionary review of this order, the funds were disbursed and Arcon then motioned this court to "return funds." A commissioner of this court denied that motion, explaining through a notation ruling that "it appears the more appropriate course is for Arcon to apply to the trial court for factual findings and a decision on a supersedeas bond under RAP 8.1, which provides an option for any party to

DISCUSSION

We review a grant or denial of summary judgment de novo, performing the same inquiry as the trial court and restricting our consideration to the issues and record called to the attention of the trial court. Sheikh v. Choe, 156 Wn.2d 441, 447, 128 P.3d 574 (2006); RAP 9.12. "Absent disputed facts, the legal effect of a contract is a question of law that we review de novo." Keystone Masonry, Inc. v. Garco Const., Inc., 135 Wn. App. 927, 932, 147 P.3d 610 (2006). "Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Lokan & Assoc., Inc. v. Am. Beef Processing, LLC, 177 Wn. App. 490, 495, 311 P.3d 1285 (2013). We view the facts and reasonable inferences in the light most favorable to the nonmoving party. Ramey v. Knorr, 130 Wn. App. 672, 685, 124 P.3d 314 (2005).

Washington follows the objective manifestation theory of contracts, which seeks to determine the mutual intent of parties to a contract in terms of the "reasonable meaning of the words used" in the writing. Estate of Carter v. Carden, 11 Wn. App. 2d 573, 582, 455 P.3d 197 (2019). We avoid interpreting contracts in a way that "would lead to absurd results." Hartford Fire Ins. Co. v. Columbia State Bank, 183 Wn. App. 599, 608, 334 P.3d 87 (2014). Contracts may be comprised of several inter-reliant documents, "including antecedent correspondence and prior written memorandums." Smith v. Skone & Connors Produce, Inc., 107 Wn. App. 199, 206, 26 P.3d 981 (2001). Contracts are generally to be construed so as to give "lawful effect" to all their provisions and are not to be interpreted in ways that would render parts of their

seek relief from any such decision by motion before this Court, see RAP 8.1(h)." Arcon did not file a motion to modify that ruling.

13

language meaningless or ineffective. Pelly v. Panasyuk, 2 Wn. App. 2d 848, 865, 413 P.3d 619 (2018). Any ambiguity in a contract is to be construed against the drafter of such contract. Sprague v. Safeco Ins. Co. of Am., 174 Wn.2d 524, 528, 276 P.3d 1270 (2012).

Loan Amount in Payment Formula

The parties dispute whether the amount of the principal "then outstanding under the Loan" under the LWA is the original principal amount of $17,615,000 or whether it can be increased by BRMK's additional advanced funds as allowed under the 2018 Construction Loan Agreement. The trial court concluded that "[t]he 'Loan' referenced by the LWA is the Construction Loan Agreement executed on July 31, 2018 . . . [which has] standard provisions in 9(d) which allow Lender (BRMK, formerly PBRELF I) to take possession and perform work and labor necessary to complete the project in the event of a default."

Summary judgement in contract construction is proper where "the parties' written contract, viewed in light of the parties' other objective manifestations, has only one reasonable meaning." Spradlin Rock Prods., Inc. v. Pub. Util. Dist. No. 1 of Grays Harbor County, 164 Wn. App. 641, 655, 266 P.3d 229 (2011) (quoting Hall v. Custom Craft Fixtures, Inc., 87 Wn. App. 1, 9, 937 P.2d 1143 (1997)). The principle of "other objective manifestations" in contract construction explicitly disregards "unilateral or subjective purposes and intentions about the meanings of what is written." Hall, 87 Wn. App. at 9 (quoting Lynott v. Nat'l Union Fire Ins. Co., 123 Wn.2d 678, 684, 871 P.2d 146 (1994)). "Interpreting a contract provision 'is a question of law only when (1) the interpretation does not depend on the use of extrinsic evidence, or (2) only one

14

reasonable inference can be drawn from the extrinsic evidence.'" Lokan & Assoc., 177 Wn. App. at 499 (quoting Tanner Elec. Coop. v. Puget Sound Power & Light Co., 128 Wn.2d 656, 674, 911 P.2d 1301 (1996)).

BRMK, quoting RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981), argues that the LWA must be viewed through the lens of the Construction Loan Agreement as a "writing[] that [is] part of the same transaction." BRMK contends that the "inter-reliant documents" evidence the definitions of the LWA's legally-significant terms. The Construction Loan Agreement was executed in July 2018 between Capitol and BRMK so that Capitol could begin the construction project. The LWA was executed in March 2019 when Capitol had become insolvent. Neither the LWA nor any of its inter-reliant exhibits reference the Construction Loan Agreement. Nor do any documents contemporary to the LWA reflect contemplation of the need for BRMK to advance additional funds in order to complete the project.

BRMK also relies on extrinsic evidence of pre-LWA negotiations related to "project costs" to support their reading of the LWA.[4] This argument is unavailing as a basic principle of construction where there is no "ambiguous term" in the written contract itself. Weyerhaeuser Co. v. Burlington N., Inc., 15 Wn. App. 314, 319, 549 P.2d 54

---

[4] BRMK only cites to half the email conversation that uses the term "project costs" but does not indicate what that term refers to. In an email to Arcon, BRMK explained that it initially added expenses associated with the sale of a unit to the loan balance, but later added expenses associated with unit sales to the closing statements for those sales "where they should have been to begin with." BRMK describes the expenses that are customary seller's fees and expenses payable to unrelated third parties as costs of staging, delinquent real estate taxes for the units, appliances, and final punch items. The LWA defines "net sales proceeds" to mean the total consideration paid to Capitol for a condominium unit less "liens recorded against the Property, real estate excise or transfer tax, escrow fees, recording fees, commissions to real estate brokers, if any, and other customary seller's fees and expenses payable to unrelated third parties, all as approved by Lender."

(1976). To the contrary, the plain language of the inter-reliant documents support reading the original "Loan" as a fixed amount. Recital A of the LWA expressly identifies the "'Loan'" as the $17,615,000 "original principal amount" the borrower (Capitol) is indebted to the lender (BRMK). Recital B states "[t]he Loan is evidenced by a Promissory Note in the amount of the Loan, executed by [Capitol] in favor of [BRMK] (the 'Note')." The Promissory Note issued to BRMK's predecessor and described in the LWA states that the loan's principle is "the sum of Seventeen Million Six Hundred Fifteen Thousand and 00/100 Dollars ($17,615,000) (the 'Principal')." The parties spelled out in the LWA when other amounts could be added to the original principal amount. They agreed that the $261,265.05 cash payment "shall be added to the unpaid balance owed by Borrower to Lender under the Loan." The LWA also allows fees and interest, with limitations, to be added.

It is undisputed that the purpose of the LWA was to find a way for all parties to get paid by avoiding a mechanic's lien so that the condominium units could still be sold. It is also undisputed that after the sale of the first 10 units, the payment formula first calculated an amount of cash to be disbursed to the lender, BRMK, before splitting the excess proceeds between BRMK and Arcon. As more units sold, more proceeds would go to the lender to pay down the outstanding loan balance.

A loan balance that increases *beyond* what is agreed to in the LWA would translate to more money to the lender and less excess proceeds to be split between BRMK and Arcon. BRMK's contention that Arcon agreed to a non-fixed loan amount in the formula where BRMK could independently choose when to advance funds without

limitation and increase the amount of the "loan" balance used in the formula to Arcon's detriment is not a reasonable interpretation.

At the time of calculating the proceeds from a sale of a unit, the formula considers the amount of principal and interest, including fees, "then outstanding under the Loan." We conclude that the plain language of the LWA, including its inter-reliant documents, has only one reasonable meaning—that the original principal "Loan" amount to be used in the formula is $17,615,000 and that the term "then outstanding under the Loan" reflects the current outstanding loan balance that includes the contemplated added cash payment, interest and fees as well as the payments towards paying down the loan from prior sale proceeds.

### Arcon's Partial Release of Deeds of Trust

The trial court found that

The terms of the LWA (see paragraph 4), the Arcon Deed of Trust (see paragraph 16), and the Indemnity Agreement were all premised upon clear, plain language which placed an unequivocal obligation on Arcon to release a Deed of Trust for each unit, as it was sold. The failure of Arcon to abide by these terms is a breach of its covenant.

BRMK and the Owners maintain that Arcon's obligation to partially release its deed of trust upon sale of each condominium unit was not conditioned on receipt of monthly payments from the sale proceeds. It appears both BRMK and the Owners mischaracterize Arcon's argument suggesting that the central issue is the "receipt" of monthly payments. While the LWA expressly states that Arcon shall receive cash payments monthly, the determination of the amount owed is calculated based on the "sale of each Unit" that incorporates "the number of unsold Units" remaining. The crux

of Arcon's claim of not receiving proper payment is based on the interpretation and application of the payment formula.

BRMK and the Owners rely on the last sentence of section 4 of the LWA that states, "Arcon shall issue a partial release from the Arcon Deed of Trust upon the sale of each unit." Certainly, when reading only the last sentence in section 4 of the ADOT in isolation, one finds support for the argument that Arcon was unequivocally required to grant partial releases of the ADOT whenever a unit sold. However, when interpreting a contract all of the contract is to be read as a whole. Weyerhaeuser Co. v. Com. Union Ins. Co., 142 Wn.2d 654, 669, 15 P.3d 115 (2000). Also, where possible, we must read the terms of the contract in a way that avoids the "absurd results" of bargained-for securities being rendered illusory. Hartford Fire, 183 Wn. App. at 608; see also Taylor v. Shigaki, 84 Wn. App. 723, 730, 930 P.2d 340 (1997).

Section 4 of the LWA states that after deduction of the "Cash Payment" ($261,265.05), "the remaining unpaid balance of the Construction Work *shall be secured* by a deed of trust (the 'Arcon Deed of Trust'), in the form attached hereto as Exhibit F, to be executed by Borrower in favor of Arcon." (Emphasis added.) The ADOT stated that the amount owed by Capitol to Arcon for Construction Work ($1,231,665) is "secured by this Deed of Trust." It acknowledged grantor's obligations to deal with matters related to the Construction Work as evidenced in the LWA, "which is also secured by this Deed of Trust." The secured obligations included performance by grantor of each agreement contained in the ADOT, LWA and Promissory Note. The ADOT states that the "Grantor will pay the amount owed for the Construction Work pursuant to the Note and [LWA], and will perform and comply with each and every term,

18

covenant and condition hereof, and of the [LWA]." Section 6 of the ADOT addresses default. Listed as an act or occurrence that constitutes default is "Failure of Grantor to pay amounts owed under the Note or to pay or perform in accordance with the [LWA]." Section 16 of the ADOT addresses partial releases: "Beneficiary shall, upon the request of Grantor grant partial releases for individual units comprising the Real Property (each, a "Unit") when a Unit is sold by Grantor *in accordance with the provisions of the Agreement*." (Emphasis added.)

We conclude from reading the inter-reliant documents as a whole that the last sentence in section 4 supports an interpretation that Arcon shall issue a partial release from the Arcon Deed of Trust upon the sale of each unit that is sold in accordance with the provisions of the LWA. To suggest that Arcon was obligated to unequivocally give up the very security it bargained for to ensure that it would get paid as agreed to under the LWA creates an absurd result and would render its security illusory.

Arcon maintains that it was not required to grant partial releases because BRMK did not comply with provisions in the LWA when units were sold. Because the ADOT requires Arcon to grant a partial release when *a Unit* is sold in accordance with the provisions of the LWA, and the LWA requires application of the disbursement formula for "the sale of each Unit," whether Arcon committed a breach is a fact-specific inquiry. Because we have also concluded that the provisions of the LWA do not allow BMRK to increase the principal loan balance in the formula by adding advanced funds under Capitol's construction loan, Arcon's contention that it was not required to perform through granting partial releases because of BMRK's material breach raises a genuine

issue of material fact.[5]  Determinations of contractual breach tend to require factual determinations unless we are truly "[a]bsent disputed facts."  Keystone Masonry, 135 Wn. App. at 932.  Where there are genuine issues of material fact, summary judgment is not appropriate.  We accordingly reverse the summary judgment order concluding Arcon breached its covenant to grant partial releases of the ADOT.

Escrowing Unit 201 Sales Proceeds

Arcon also challenges the trial court's conclusion that the draft escrow agreement of October 2020 discussed between Arcon and BRMK was not a modification of the LWA and was unenforceable.  The trial court found no agreement existed, firstly because "[t]o be enforceable, the three parties must have agreed to all material terms.  There is no evidence of Fidelity's assent to the terms."  The trial court also found a lack of valid consideration from Arcon, as the release of its deed of trust was a preexisting covenant under the LWA.

The existence of a contract must be proved by the party asserting its existence.  P.E. Sys., LLC v. CPI Corp., 176 Wn.2d 198, 209, 289 P.3d 638 (2012).  An enforceable contract requires offer, acceptance, and consideration.  Yakima County Fire Prot. Dist. No. 12 (W. Valley) v. City of Yakima, 122 Wn.2d 371, 388-89, 858 P.2d 245 (1993).  "As a general rule the performance of, or promise to perform an existing legal obligation is not a valid consideration."  Harris v. Morgensen, 31 Wn.2d 228, 240, 196 P.2d 317 (1948) (quoting 17 C.J.S. Contracts § 110 (1939)).  Modification of an existing contract is not supported by consideration if "one party is to perform some additional obligation while the other party is simply to perform that which he promised in the

---

[5] BRMK contends that the alleged underpayments to Arcon were a result of inadvertent and non-material accounting errors that did not rise to a level of material breach.

original contract." Rosellini v. Banchero, 83 Wn.2d 268, 273, 517 P.2d 955 (1974). However, a "breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." Jacks v. Blazer, 39 Wn.2d 277, 285, 235 P.2d 187 (1951) (citing RESTATEMENT (FIRST) OF CONTRACTS § 397 (1932)). Finally, forbearance of a right to assert a legal claim "on which there exists a reasonable possibility of recovery" may constitute sufficient consideration for a promise. Nat'l Bank of Wash. v. Myers, 75 Wn.2d 287, 296, 450 P.2d 477 (1969) (citing Nicholson v. Neary, 77 Wash. 294, 295-96, 137 P. 492 (1914)).

First, it is significant that BRMK does not dispute that it came to agreement with Arcon to set aside the sale proceeds of Unit 201 in escrow. In fact, BRMK was surprised to learn that the proceeds after the sale were sent directly to BRMK. And it maintains on appeal that it has no explanation as to what happened to the draft agreement. Thus, BRMK does not deny that it reached an agreement with Arcon, but argues that such agreement is unenforceable because the draft agreement was never agreed to by Fidelity. However, the fact that a draft agreement indicated that Fidelity would be the escrow company to hold the proceeds does not make Fidelity a necessary party as to whether BRMK and Arcon modified the LWA as to Unit 201 through offer, acceptance and consideration. We agree with Arcon that Fidelity was not a necessary party to an informal agreement of terms between Arcon and BRMK with the purpose of "subsequently execut[ing] and deliver[ing] . . . [a] more formal contract." (quoting Morris v. Maks, 69 Wn. App. 865, 872, 850 P.2d 1357 (1993).

The question is whether Arcon's offer to grant a partial release of its ADOT as to Unit 201 qualified as consideration considering Arcon already had an obligation to grant a partial release of units sold in accordance with the provisions of the LWA. The answer to that question remains a genuine issue of material fact. If Arcon is correct that BRMK materially breached the LWA and relieved Arcon of its obligation to perform under the LWA, then at the time BRMK and Arcon agreed to set aside the proceeds from the sale of Unit 201 in exchange for Arcon to grant a partial release of its ADOT as to that unit, that promise could be consideration that did not already exist at that time. "On summary judgment, the trial court may not weigh the evidence, assess credibility, consider the likelihood that the evidence will prove true, or otherwise resolve issues of material fact." Haley v. Amazon.com Services, LLC, 25 Wn. App. 2d 207, 217, 522 P.3d 80 (2022).

For these reasons, which are different than the trial court's reasoning, we affirm the trial court's denial of Arcon's motion for partial summary judgment against BRMK for breaching the modified LWA as to Unit 201.

### Third-party Beneficiaries

Arcon next challenges the trial court's conclusion that because the Owners were third-party beneficiaries to the LWA, they could sue Arcon to enforce the obligation to partial releases of deed of trust upon sale of condominium units.

"A third-party beneficiary is one who, though not a party to the contract, will nevertheless receive direct benefits therefrom." McDonald Constr. Co. v. Murray, 5 Wn. App. 68, 70, 485 P.2d 626 (1971). "'The question whether a contract is made for the benefit of a third person is one of construction. The intention of the parties in this

22

respect is determined by the terms of the contract as a whole construed in the light of the circumstances under which it was made.'" McDonald, 5 Wn. App. at 70 (quoting Grand Lodge of Scandinavian Fraternity v. United States Fid. & Guar. Co., 2 Wn.2d 561, 569, 98 P.2d 971 (1940)). "It is insufficient that performance of a contract may benefit a third party; rather, the contract must have been entered for that party's benefit, or the benefit must be a direct result of performance within the parties' contemplation." Key Dev. Inv., LLC v. Port of Tacoma, 173 Wn. App. 1, 29, 292 P.3d 833 (2013) (citing McDonald, 5 Wn. App. at 70)). "A third-party beneficiary contract exists when the contracting parties, at the time they enter into the contract, intend that the promisor will assume a direct obligation to the claimed beneficiary." Warner v. Design & Build Homes, Inc., 128 Wn. App. 34, 43, 114 P.3d 664 (2005) (citing Postlewait Constr., Inc., v. Great Am. Ins. Companies, 106 Wn.2d 96, 99, 720 P.2d 806 (1986)). "The test of intent is an objective one: Whether performance under the contract necessarily and directly benefits the third party." Warner, 128 Wn. App. at 43 (citing Postlewait Constr., Inc., 106 Wn.2d at 99).

Arcon argues that Capitol, BRMK and Arcon jointly only had one objective and that was to figure out how to get paid, not to benefit future condominium owners. But Arcon conflates motivation with the type of intent contemplated to create a third-party beneficiary. Our Supreme Court in Vikingstad v. Baggott, quoted R.T. Kimbrough, Annotation, Right of Third Person to Enforce Contract Between Others for His Benefit, 81 A.L.R. 1271, 1287 (1932) in order to explain this distinction:

where, under a topic heading entitled, "*d. Intention or object of parties; direct or incidental benefit*," it is stated:

> If the terms of the contract *necessarily require the promisor to confer a benefit upon a third person*, then the contract, and hence the parties thereto, *contemplate a benefit to the third person* * * * [citation]; and this should be sufficient to enable the latter to enforce the contract, although it also worked to the advantage of the immediate parties thereto * * * [citations], and although the actual purpose motivating the parties in making the provision in question was the purely selfish one of benefiting or protecting themselves, rather than of benefiting the third person. The 'intent' which is a prerequisite of the beneficiary's right to sue is 'not a desire or purpose to confer a particular benefit upon him,' nor a desire to advance his interests, but an intent that the promisor shall assume a direct obligation to him. * * * [Citation] So long as the contract necessarily and directly benefits the third person, it is immaterial that this protection was afforded him, not as an end in itself, but for the sole purpose of securing to the promisee some consequent benefit or immunity. In short, the motive, purpose, or desire of the parties is a quite different thing from their intention. The former is immaterial; the intention, as disclosed by the terms of the contract, governs. * * * (Emphasis supplied.)

46 Wn.2d 494, 496-97, 282 P.2d 824 (1955) (alterations in original).  The parties needed not desire to benefit the condominium owners.  They simply had to have intended that Arcon, the promisor, assume a direct obligation to grant a partial release of the ADOT to each buyer of a condominium unit.

Arcon argues that its circumstance is analogous to the circumstances in McDonald, 5 Wn. App. at 68, and Simons v. Tri-State Const. Co., 33 Wn. App. 315, 655 P.2d 703 (1982).  Both of these cases are distinguishable.

This court held in McDonald that a prospective tenant of a premises had no third-party beneficiary right of action against a contractor for breach of its construction contract with the building's owners.  5 Wn. App. at 70-71.  The construction was completed much later than the contracted completion date.  Id. at 68.  The prospective tenant argued that it was a third-party beneficiary because the owners knew it was to

24

become the tenant when the construction project was completed.  <u>Id.</u> at 70.  We explained that any benefit the tenant received flowed from the intervening tenancy agreement with the owners, not the construction contract.  <u>Id.</u>  In other words, the contractor contracted to complete the project within a certain amount of time regardless of whether the owner chose to lease the property.

Capitol, BRMK, and Arcon devised a complex agreement by which the insolvent Capitol could pay its debts: this required avoiding a mechanic's lien so that the condominium units could be sold.  To do this, Arcon was granted a deed of trust as security, but in an arrangement where Arcon would grant partial releases of that deed as units were sold in accordance with the LWA.  None of the contracted parties could perform their obligations under the LWA without the buyers of the units, and the new owner of a unit would benefit from a title not subject to the ADOT.  Unlike the prospective tenant in <u>McDonald</u> whose use of the building was dependent on the existence of a lease, a unit owner in the instant case benefits from having a title unencumbered by the ADOT which is a direct result of performance within the parties' contemplation.

In <u>Simons</u>, 33 Wn. App. at 317-18, a home owner sued the general contractor of a sewer relocation project for the City of Hoquiam.  The home owner argued that it was a third-party beneficiary because the contract between the general contractor and the city had an indemnity clause.  "In general, only an indemnitee or someone in his right is entitled to sue on a contract of indemnity. Thus, a third party is not entitled to sue on an indemnity contract unless he is able to prove the contract is not 'merely for indemnity, but also creates a direct obligation in his favor.'"  <u>Id.</u> at 323 (quoting 42 C.J.S. <u>Indemnity</u>

§ 29 (1944)).  Nothing in the contract in <u>Simons</u> suggested that anyone other than the city was to benefit from the agreement.  <u>Id.</u> at 324.  <u>Simons</u> is inapposite.

A benefit to the Owners, titles unencumbered by the ADOT on purchased condominium units, *does* "flow directly from the contract" rather than being a "merely incidental, indirect or consequential" outcome of its performance.  <u>McDonald</u>, 5 Wn. App. at 70.  Accordingly, under the facts before us, we affirm the summary judgement order determining the Owners to be third-party beneficiaries of the LWA.

<u>Quieting Title and Permanently Enjoining Foreclosure</u>

Arcon does not challenge the trial court's order of a preliminary injunction,[6] but it does challenge the trial court's order permanently enjoining Arcon from foreclosing on the condominium units and quieting title.

Because we have concluded that genuine issues of material fact remain as to whether Arcon breached its covenant by not granting partial releases of the ADOT, the trial court erred in quieting title and deciding as a matter of law that Arcon should be permanently enjoined from exercising its right to foreclose.

CONCLUSION

We affirm the summary judgment order determining that the Owners are third-party beneficiaries under the LWA.  We reverse the summary judgment order concluding that the payment formula under the LWA allows for the addition of BRMK's advanced funds.  Because genuine issues of material fact remain, we reverse the summary judgment order 1) finding that Arcon breached its covenant to grant partial

---

[6] The trial court on September 7, 2021 granted a request for an injunction against a foreclosure sale by Arcon.  That order was entered to "preserve the status quo pending the final outcome of [the] case" in accordance with CR 65.

releases of the ADOT; 2) permanently enjoining Arcon from exercising its right to foreclose under the ADOT; and 3) quieting titles.  However, we affirm, for different reasons, the trial court's denial of Arcon's partial summary judgment motion requesting the court conclude that BRMK breached a modification of the LWA as to Unit 201.[7]

Affirm in part, reverse in part and remand.[8]

_Cohen, J._

WE CONCUR:

_Feldman, J._

_Birk, J._

---

[7] Arcon asks this court to address whether Arcon is required to indemnify Fidelity for losses under its Indemnity Agreement.  Though Fidelity raised this issue in its reply brief in support of the motion for a preliminary injunction, no order to that effect is part of this discretionary review and Arcon does not cite to a ruling by the superior court as to this issue. The matter is not before us warranting review.

[8] Both Arcon and BRMK request attorney fees as the prevailing party under the attorney fees provision of the LWA.  However, "this is a petition for discretionary review of interlocutory orders.  There has been no final judgment and, therefore, there has been established no prevailing party." Estate of Carter, 11 Wn. App. 2d at 589 n.7 (2019).  Accordingly, we deny both requests at this time.  On remand, the trial court is directed to determine what, if any, award either party is entitled to for its appellate efforts in the event there is a prevailing party. RAP 18.1(e).